THE M. M. CHASE.[1]

THE G. P. TRIGG.

HANSEN *et al. v.* THE M. M. CHASE.

SAME *v.* THE G. P. TRIGG.

*(District Court, S. D. New York.   February 6, 1889.)*

1. SHIPPING—CARRIAGE OF GOODS—SEIZURE BY LEGAL PROCESS—DUTY OF CARRIER.
    A carrier by sea, whose cargo is attached by legal process, is bound to interpose in the suit, and to protect the interest of a foreign cargo-owner, by all necessary and appropriate means under the local law, until the consignee is properly informed, and has reasonable opportunity to take on himself the burden of litigation; and to give prompt notice of the attachment, and any other necessary information.

2. SAME.
    Bills of lading were issued for cargo taken on board two vessels. Drafts were drawn by the consignor against the goods, which were negotiated, and accepted on the faith of the bills of lading. The goods were afterwards attached at the port of loading in a suit against the consignor, and removed from the vessels against the master's protest; but prompt notice of the attachment was not given to the consignee, nor were such legal means taken as the state laws specially provided to defend the goods or to secure the consignee's interests, which means, if taken, might have averted the seizure. *Held*, that the vessels were therefore liable to the consignees for non-delivery of the goods.

3. SAME—BILLS OF LADING—IMPLIED EXCEPTIONS.
    *Semble*, under the decision in *Stiles v. Davis*, 1 Black, 101, a seizure by judicial process of goods in the possession of a carrier, not brought about by laches or connivance on the part of the carrier, and of which he gives prompt notice to the owner, is one of the implied exceptions in the carrier's contract, limiting, *pro tanto*, the rule of the common law that the carrier is liable for non-delivery under the bill of lading through any causes not excepted therein; but this does not absolve the master of a vessel from his maritime duty to intervene for the protection of a foreign owner's interests.

In Admiralty.   Libel for non-delivery of cargo attached under legal process.

In August, 1888, P. M. Kane, at Eastport, Me., shipped upon the above-named schooners three lots of sardines, consigned to the libelants in this city, for sale on commission; one lot on board the Trigg on August 9th, and two lots on board the Chase on August 13th and 16th. Bills of lading were delivered to the shipper on the same dates, making the goods deliverable to the libelants at this port.   Kane, on the same days, respectively, drew upon the libelants against the goods consigned, notified them thereof by letter, inclosing the bills of lading, and on the same day got the drafts cashed at the Frontier National Bank, at Eastport.   The drafts were each payable at five days' sight to the order of the cashier of that bank.   They were presented in due course, and, upon the faith of the bills of lading previously received by the libelants,

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

were accepted as follows: August 14th, draft for $450; August 16th, draft for $400; August 20th, draft for $200. The first draft was against the Trigg's bill of lading; the last two against those of the Chase. All were paid at maturity.

On August 20th, all the sardines in question were seized and removed from both schooners by the sheriff of the county, at Eastport, under a writ of attachment issued out of the supreme court of Maine, in a suit by Blanchard and others against Kane, the shipper, in an action of debt for the sum of $1,100, upon which judgment was afterwards entered at the October term, and the goods sold. The sheriff received the attachment on Friday, the 17th, and his return states a levy about 3 P. M. of that day. On Saturday keepers were put in charge. The master protested against the attachment. stated the issue of bills of lading, and much talk ensued with the captains, managing owner, and attaching creditor. On Saturday afternoon, however, it was understood that the attaching creditor would give to the sheriff a bond of indemnity for the removal of the goods, which was done on Monday, the 20th. The first notice to the libelants was a telegram sent them by the managing owner between 11 and 12 o'clock on Monday, stating that Kane's shipments were attached that morning, and that the sheriff was removing the goods. The telegram was received by the libelants late in the afternoon, after the draft of $200 had been accepted. The next morning they replied by telegram that they "held the bills of lading and had made full advances on the goods," adding, "Can you attend to the matter and secure us? Answer." The next day, the 22d, the managing owner replied: "Will do what I can for you. You must send power to make demand for the sardines." Nothing further was done by either party until the arrival of the schooners in this port, when they were libeled in these suits for damages for the non-delivery of the goods according to the contract of the bills of lading.

The statutes of Maine provide (chapter 81, §§ 43–45,) that "property mortgaged, pledged, or subject to any lien created by law, and of which the debtor has the right of redemption, may be attached, held, and sold as if unincumbered, * * * if the attaching creditor first tenders or pays to the mortgagee, pledgee, or holder the full amount unpaid of the demand so secured thereon;" that when property attached is claimed by virtue of such pledge or lien the claimant "shall not sue the attaching officer until he has given him at least 48 hours written notice of his claim, and the true amount thereof," and "the officer or creditor may within that time discharge the claim by paying or tendering the amount due thereon, or he may restore the property;" that the officer may give the claimant "written notice of the attachment, and, if he does not within ten days thereafter deliver to the officer a true account of the amount due on his claim, he thereby waives the right to hold the property thereon." By section 40, when property attached is claimed by a person not a party, he may replevy it within 10 days after notice given him therefor by the attaching creditor, and not afterwards; and thereafter the attaching officer, without impairing the rights of such person, at the

request and on the responsibility of the plaintiff, may sell the property.

Kane had been dealing with the libelants in the same way for some-time previous, and was largely indebted to them on general account.

*Wing, Shoudy & Putnam,* for libelants.

*Goodrich, Deadg & Goodrich,* for claimants.

BROWN, J., (*after stating the facts as above.*) In the case of *Stiles* v. *Davis,* 1 Black, 101, the supreme court decided that the carrier was not liable in trover for non-delivery to the true owner of goods attached and taken from the carrier's possession by the sheriff under process against a third party. The decision did not turn upon the form of the action. The grounds stated in the opinion are that the goods when seized under judicial process are in the custody of the law, and that the plaintiff had mistaken his remedy as to the persons liable. "They should have brought their action," it is said, "against the officer who seized the goods, or against the plaintiff in the attachment suit, if he directed the seizure." Mr. Justice CLIFFORD in *Wells* v. *Steam-Ship Co.,* 4 Cliff. 232, says that such "clearly" was the decision. This is not at all incompatible with the subsequent qualifications added by the decisions of the tribunals of several of the states, and now generally laid down in text-books, namely, that the seizure must not be brought about by any laches or connivance of the carrier, and that he give prompt notice of the attachment. These qualifications seem also to have the approval of Mr. Justice CLIFFORD in the case cited. .

The whole subject has been exhaustively reviewed by HAMMOND, J., in the case of *Robinson* v. *Railroad Co.,* 16 Fed. Rep. 57, 9 Fed. Rep. 129, where the carrier was held liable for laches after notice of the intent to attach. See Hutch. Carr. §§ 367.–375; Schouler, Bailm. §§ 428, 498; *Mierson* v. *Hope,* 2 Sweeny, 561; *Railway Co.* v. *Yohe,* 51 Ind. 181; *Bliven* v. *Hudson, etc., Co.,* 36 N. Y. 403. I feel bound to hold, therefore, that seizure by judicial process under the conditions above stated has been added as one of the implied exceptions in the carrier's contract, limiting, *pro tanto,* the general rule of the common law that the carrier is liable for non-delivery under the bill of lading through any causes not excepted therein.

The further question remains, whether the master, from the time he had notice of the attachment, performed the duties imposed upon him by the maritime law, in the protection of the libelants' interests. The duty of protection is to a certain degree recognized as incumbent upon carriers by land. Hutch. Carr. § 202. The duty of giving notice is one form of this obligation. The general duty of protecting the owner's interests is, however, more specially applicable to carriers by sea, from the more frequent necessity of it in maritime commerce; and it has accordingly long been a prominent feature of the maritime law. The powers and the duties of ship-masters arising out of the exigencies of navigation, and the circumstances and relations growing out of foreign commerce are much broader than those of carriers by land within the kingdom. The master of a vessel, in all such exigencies, has authority to

do whatever is necessary to preserve the interests of a foreign owner or consignee. He is bound to the exercise of diligence and good faith; to give the owner or consignee timely and needful information; and to take his instructions, when practicable. In case of capture or seizure it is his duty to interpose a proper claim, and to defend the rights of the owners of the ship and cargo. 3 Kent, Comm. *213; *Cheviot* v. *Brooks*, 1 Johns. 364; *Lemon* v. *Walker*, 9 Mass. 404; *Hannay* v. *Eve*, 3 Cranch, 247. In *Willard* v. *Dorr*, 3 Mason, 166, Story, J., says, in reference to a seizure at Calcutta:

"He has not only a right, but it is his imperative duty, to remain by the ship until a condemnation, or all hope of recovery is gone. He is intrusted with the authority and obligation to interpose a claim for the property before the proper tribunal, and to endeavor by all the means in his power to make a just and successful defense. To abandon the ship to her fate without asserting any claim would be a criminal neglect of duty, and would subject him to heavy damages for a wanton sacrifice of the property. * * * His duties do not, indeed, cease even with condemnation, but he is to act for the benefit of all concerned; and, if he should deem an appeal to be expedient, he is bound to enter it."

In the case of *The Mary Ann Guest*, Olcott, 501, where the libelant, as in this case, had made advances on the bill of lading, but was not the consignee named therein, the schooner was held liable by Betts, J., because, as he says, the bill of lading "guaranties to protect the right of possession to the shipper and his assigns," and because the master "did not interpose, as he might have done, in the replevin suit against the shipper;" and on appeal the decision was affirmed by Mr. Justice Nelson, (1 Blatchf. 358.) Upon the decision in *Stiles* v. *Davis*, *supra*, I do not feel at liberty to follow *The Mary Ann Guest*, so far as to hold the bill of lading an absolute guaranty that the master will protect the consignee's right of possession. But upon the well-settled rules of maritime law it is the undoubted duty of the master, upon any interference with his possession, whether by legal proceedings or otherwise, to interpose for the owner's protection, and to make immediate assertion of his rights and interests, by whatsoever measures are appropriate at the time and place. To that extent the master is bound to take part in legal proceedings, and to continue them until, after informing his absent consignee both of the facts and the local law so far as need be, the owner has a reasonable opportunity to take upon himself the burden of the litigation. The question arises under the law of the sea, not of the land. Upon maritime questions, the states are treated as foreign to each other, and the same general obligation is applicable as if the ship were in a foreign country. The general rule is the same, whether the ship and the consignee are nearer or more distant. Its application varies. Where communication may be had daily or hourly, the duty of speedy notice is the more imperative, and the ship has the corresponding advantage of being able to terminate her obligations to the cargo-owner the more quickly.

I must hold the respondents answerable in this case both for laches, and because they did nothing beyond mere protest, without using the pre-

liminary means that, under the law of the state, were specially provided to secure the libelants' interests.

1. Timely notice of the attachment proceeding itself was not given. Notice was delayed until the third day afterwards. Had a telegram been sent on Friday, or even on Saturday afternoon, instead of Monday forenoon, the acceptance of the draft of $200 would have been prevented.

2. No such notice of the libelants' claim and lien as the statutes of Maine provide for was given to the sheriff by the master or managing owner, as should have been given. The sheriff's proceeding was cautious. Kane, being general owner, the attachment was rightly levied, provided the libelants, as consignees, had made no advances on the goods, and consequently had no lien thereon. But the consignees, by their advances, had a "lien created by law," within the very letter of the statute. The attaching creditor was doubtless acquainted with the general mode of dealing between Kane and the libelants; and he might therefore reasonably expect that, if there was any lien upon the goods for advances, it would be made known in the manner provided for in the state law, and could be verified; and that, if found correct, the lien could be paid off, at less than the value of the goods; or, if it amounted to their full value, that the attachment might then be relinquished. To hold the goods after a lien on them was made known, without offering to pay it, would be a plain trespass under the law of that state. *Stief* v. *Hart*, 1 N. Y. 28; *Campbell* v. *Conner*, 70 N. Y. 424, 428. The evidence does not show any intention to commit a trespass, or to assume a position that could not be maintained. Had the facts been made known to the sheriff, or to the attaching creditor, they could have been verified by either probably within a few hours; and presumptively the levy on two of the lots at least would have been released, as the debtor had no valuable attachable interest in them. *Mutual* v. *Sturgis*, 9 Bosw. 665. All that was needed to secure the libelants' rights was apparently to give written notice of their lien, as provided by law. There is no reason to suppose that the facts in regard to the consignees' interests could not have been learned by the master within a few hours after the attachment, upon inquiry of the shipper at Eastport. The letters of August 20th and 22d from the managing owner show conclusively that he was well informed of the shipper's affairs, and knew that the libelants were selling on commission, and that Kane had got advances on these goods. But without regard to that, had the master or the managing owner communicated with the libelants as soon as notice of the attachment was given by the sheriff, instead of waiting until Monday, they would plainly have received sufficient information to serve the notice provided by law, and probably in time to prevent even any removal of the goods on which the drafts had been already accepted.

3. After receipt of the libelants' telegram of the 22d, neither the master nor the managing owner took any steps to secure the libelants, as was promised in the answering telegram. They were informed that the libelants had advanced upon bills of lading to the value of the goods. If they did not know the value it was easy to ascertain it by inquiry, so far as

was neccesary to give written notice of the lien. They knew, or are presumed to have known, the requirements of the law of their own state. There is no such presumption as respects the libelants. The respondents' reply, to "send power to make demand for the sardines," was frivolous and impertinent. No demand was necessary, or, if needed for any purpose, the master had full authority already. After proper notice of a lien, the master, as representative of the cargo interests, had every power that was needed to enforce the rights of the absent consignee. Such a request, with nothing done by the master or managing owner after this promise by telegram; with the further fact, testified to by the sheriff, that the master or managing owner refused to make any demand for their freight, to which in any event they were legally entitled, (*Tindal* v. *Taylor*, 4 El. & Bl. 219,)—shows a deliberate intent not to follow the course marked out by the statute, which was designed for the protection of both. Whether the consignees' remedy against the sheriff was thereby lost, the evidence is not sufficient to show. But this is immaterial. The respondents must be held liable to the consignees, because they wholly failed to perform their duty; and they must look for indemnity to the sheriff or attaching creditor, if they have not lost that right by their own laches. The libelants are not bound to prove that the goods would certainly have been saved. The burden is on the respondents to prove that pursuing the course required by law could not possibly have made any difference. *The Pennsylvania*, 19 Wall. 125, 136; *The Frank P. Lee*, 30 Fed. Rep. 277, 280; *The Dentz*, 29 Fed. Rep. 526, 528.

This is not shown either as to the draft of $200, or as respects the payment of the l. n, or the return of the goods.

If the value of the goods was more than the advances, the libelants probably had an additional lien to their full value from the time of their receipt of the bills of lading and the acceptance of the drafts thereon, because of the balance due them as factors on general account. As no excess of value, however, is proved, a decree is directed for the libelants in the case of the Trigg for $450 only, with interest and costs, and in the case of the Chase for $600, with interest and costs.