**UNIVERSE TANKSHIPS, Inc., Plaintiff,**

v.

**PYRATE TANK CLEANERS, Inc., Defendant.**

United States District Court
S. D. New York.

June 10, 1957.

 

Thacher, Proffitt, Prizer, Crawley & Wood, New York City, for plaintiff. John C. Crawley, Edward C. Kalaidjian, John J. Leibell, New York City, of counsel.

Hill, Rivkins, Middleton, Louis & Warburton, New York City, for defendant. Allan B. Lutz, John G. Poles, James E. Kent, New York City, of counsel.

HERLANDS, District Judge.[1]

In this action for property damages caused by an explosion aboard a supertanker, all of the crucial issues turn upon questions of credibility. The controlling evidence, for the most part presented in open court, is sharply conflicting.

Mindful of its fact-finding responsibility in this non-jury case, the Court has evaluated the reliability of the witnesses in terms of the inherent persuasiveness of their testimony and their relative credibility. In making such appraisal, the Court has closely considered the demeanor of the witnesses on the stand, their manner of testifying, their frankness or lack of candor, their partisanship or impartiality, and the testimonial effect of any motive or bias.

Plaintiff is the owner of the supertanker Bulkpetrol. Defendant is a professional tank cleaning company. The action seeks to recover damages for injury done to the vessel through an explosion in her No. 4 port wing tank (referred to in this opinion as "the tank"), where defendant's employees were at work. The explosion occurred at about 8:05 p. m. on December 25, 1951.

Commenced as an action at law, based on diversity, the cause was transferred to the admiralty side on plaintiff's motion, made at the beginning of the trial and granted at the close of plaintiff's case, after a motion to dismiss for insufficiency of proof had been argued and denied (3562, 3629–3630). Cf. W. E. Hedger Transp. Corp. v. United Fruit Co., 2 Cir., 1952, 198 F.2d 376, certiorari denied 1952, 344 U.S. 896, 73 S.Ct. 275, 97 L.Ed. 692; Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 409, 411, 74 S.Ct. 202, 98 L.Ed. 143; Pioneer Steamship Co. v. Hill, 6 Cir., 1955, 227 F.2d 262, 264; Cannella v. Lykes Bros. S. S. Co., 2 Cir., 1949, 174 F.2d 794, 797.

At all of the material times plaintiff was (and is) the owner and operator of the Bulkpetrol. This steamship is a supertanker. It was built by plaintiff at Norfolk, Virginia and was completed in November 1948. It is classed A 1 (E), Oil Carrier, with the American Bureau of Shipping. The vessel is about 629 feet long over-all; 84 feet in breadth; and approximately 44 feet deep (Exhs. 13, 22, 130; Shorrock, 291–292).

Defendant was and is a professional tank cleaning company. It has been engaged since 1936 in the business of cleaning and gas-freeing petroleum tanks, including both marine and land storage tanks (Kennedy, 206).

The basic factual issues may be spotlighted by stating the major questions:

(1) The first involves the nature of the legal relationship between plaintiff and defendant before and at the time of the explosion. Plaintiff claims that defendant was an independent contractor and solely responsible for the proper performance of the tank-cleaning and gas-freeing job for which it was engaged. Vigorously disputing plaintiff's claim, defendant asserts it was either an employee of plaintiff or a joint venturer with respect to the tank-cleaning and gas-freeing project. The Court finds that defendant was an independent contractor at all material times.

(2) The second question concerns the cause of the explosion. Plaintiff charges that the explosion was triggered by the exposure of the incandescent filament of an electric light bulb within defendant's defective droplight (Exh. 3), which was suspended by defendant in the tank by means of a cable (Exh. 69). Defendant argues that there is neither proof of the actual cause of the explosion nor of defendant's ownership of Exhibits 3 and 69. Moreover, it is defendant's position that the evidence is so inconclusive and speculative that the Court should find that the

---

[1]. Except as otherwise indicated, references are to the stenographer's minutes of the trial record. Libelant will be referred to as plaintiff; respondent as defendant. The trial commenced April 4, 1956 and ended June 29, 1956. The trial record, exclusive of exhibits, amounts to 6968 pages.

explosion might have been the result of any one of a large number of equally possible causes, none of which is attributable to defendant's negligence. The Court finds that plaintiff's contention as to the cause of the explosion is established by a preponderance of the credible evidence.

(3) The third question is whether defendant had reasonable ground to believe that it would be extraordinarily hazardous to risk the exposure of a burning electric bulb filament in the tank by the use of its droplight (Exh. 3) on the evening of December 25, 1951, under the conditions and circumstances then prevailing in that tank. Plaintiff claims (and defendant denies) that defendant had reasonable ground to foresee the danger of exposing a burning electric bulb filament in the tank. The Court finds that plaintiff's claim is clearly sustained by the weight of the reliable evidence.

(4) The fourth question is whether defendant took ordinary care with respect to its equipment, methods and personnel, to prevent the exposure of the burning filament in the explosive, gaseous atmosphere of the tank. The Court finds that defendant was negligent in the respects indicated; and that such negligence was the proximate cause of the explosion.

(5) The final question is raised by the defense contentions that, in any event, plaintiff is barred from recovery because (a) plaintiff was guilty of statutory fault in violating an applicable Coast Guard regulation, (b) plaintiff was contributorily negligent, and (c) plaintiff assumed the risk of the explosion. The Court rejects all of these defenses as without merit in point of fact and law.

Two over-all groups of findings and conclusions may be summarized as follows:

### I.

Defendant provided a defective droplight (Exh. 3) in the tank. This droplight was used by two of defendant's muckers, Ohlsen and Hofstetter, who were negligently permitted by defendant to work in that gassy tank at a time when the tank had not been properly tested for its toxic and explosive gas content.

The disturbance of the droplight by Ohlsen (as he fell while in the tank) and by Israelson, another of defendant's employees (who, while stationed at the hatch opening to the tank, was simultaneously pulling on the cable in order to raise the droplight) were added links in the chain of causation. Ohlsen's and Israelson's acts, operating singly or conjointly, resulted in a moving blow of the defective Pyrex glass bowl on defendant's droplight against one of the nearby steel structures located inside the tank.

This impact cracked or smashed the glass bowl and the lighted electric bulb within the bowl. As a result, the incandescent filament was exposed to the explosive gases in the tank. Instantly, there was an explosion.

Ohlsen had slipped and fallen because he was made dizzy by the toxic gases in the tank. Defendant should not have permitted Ohlsen to enter the tank before it had been properly gas-tested. Ohlsen's fall was facilitated by the slippery, oily surface on which he was walking. These events and conditions were reasonably foreseeable by defendant. The consequences of these happenings could have been avoided if defendant had not used a defective droplight.

Thus, the explosion was the proximate result of defendant's failure to use that measure of care with respect to its personnel, equipment and methods of work which a person of ordinary prudence would have exercised as necessary and appropriate under the circumstances prevailing on December 25, 1951 in No. 4 port wing tank.

### II.

Plaintiff's witnesses, both lay and expert, were impressively reliable and persuasive. Their testimony established all of the material elements of plaintiff's case. The Horvitz, Stewart and Phillips expert testimony, in particular, was clear and convincing.

On the other hand, defendant's major lay witnesses—Allen, Kennedy, Lane and Lamanna—gave testimony which, to the extent that it differed with that adduced by plaintiff's witnesses, was unreliable. Such defense testimony appeared quite clearly to the Court to have been custom-tailored to meet the exigencies of defendant's case. The Court has substantially discounted such testimony.

Defendant's two witnesses who were called as electrical experts revealed a lack of qualification and expertise. They were but poorly disguised advocates for defendant. Their testimony in this case lends clinical support to the criticism of "expert evidence" voiced by Professor Morgan and to the remedial recommendations contained in the Model Code of Evidence drafted by the American Law Institute. American Law Institute, Model Code of Evidence (1942) pp. 34–36, 198–216. Cf. 43 A.B.A. Journal (Feb. 1957), Explosion Damage Cases: Insurance Procedure and Expert Witnesses, 135, at 137.

We turn now to the detailed findings and conclusions.

On December 21, 1951, the Bulkpetrol arrived at Marcus Hook with a cargo of Kuwait crude oil. This cargo was discharged at the Hog Island dock of the Gulf Oil Corporation (Philadelphia) between 9:20 p. m. on December 21, 1951 and 6:40 p. m. on December 22, 1951 (Deck Log, Exh. 22; Bird, 1347).

About a week or ten days prior to December 21, 1951, at the solicitation of defendant, plaintiff engaged defendant, as an independent contractor, to clean and gas-free the vessel and prepare her for a periodic overhauling at the Bethlehem Baltimore shipyard (212; 1344–1345). The contract was oral. It was entered into in New York (4285–4286), between Kennedy, defendant's secretary and business solicitor (211–212, 778–780, and Walling, plaintiff's marine superintendent (4282). It was agreed that defendant would provide the necessary labor, materials, equipment and supervision (Kennedy, 212, 780; Walling, 4289, 4312), and that the work would be done on a cost-plus basis (Kennedy, 792; Walling, 4286; Exh. 11).

Pursuant to the contract, in the evening of December 22, 1951, several of defendant's employees, including its general foreman for the job, Lamanna, and its pumpman, Doyle, boarded the vessel, with their equipment, which they had brought with them by truck from defendant's headquarters at Bayside, New York (Lamanna, 3728–3730; Doyle, 3632–3633; Deck Log, Exh. 22; Hansen 511).

Defendant's equipment which was put aboard the vessel included, among other things, eight droplights with cables and plugs, junction boxes, adapters, two water blowers, hose, lines, aluminum pails and shovels, rubber boots, flashlights, and other articles required for defendant's work (Exh. 66; Shorrock, 316; Allen 852–853; cf. Kennedy, 217–218; Lane, 3955–3956). Defendant's equipment included "everything * * * needed to clean that type of ship" (Kennedy, 242). Defendant's equipment included some Russell & Stoll droplights (Kennedy, 219).

Plaintiff's representative aboard the vessel was Shorrock, a shore pumpman in plaintiff's regular employ, who had been assigned by plaintiff to act as the liaison between defendant's representatives and the personnel of the vessel, in order to facilitate defendant's operations, and in order to inspect the results of defendant's work (Shorrock, 274, 317; Walling, 4315–4316; Bird, 1450–1451). Shorrock's duty was to see that the results were satisfactory; it was not his duty to supervise the personnel, methods and equipment used by defendant (Walling, 4315–4316).

Shorrock, as well as the officers and crew of the vessel, were duly informed that defendant, as an independent contractor, had undertaken to clean and gas-free the vessel in preparation for the Bethlehem shipyard (Bird, 1344–1347; Shorrock, 315; Hobein, 1266).

The ship's pumpman, Hobein, familiarized defendant's pumpman, Doyle,

with the vessel's piping system and with the manner of operating the pumps (Doyle, 3640–3641, 3644; Hobein, 1159, 1266–1267, 1280, 1289–1291).

Doyle (cf. 3684–3686, 3651, 3680) thereupon assumed and performed the duties for which defendant had assigned him to the vessel; and he operated the pumps and the piping valves (Lamanna, 3845–3846; Hobein, 1265–1266; Doyle, 3689; Hansen, 461).

About 10 p. m. on December 22, 1951, defendant's employees commenced washing (variously described as "machining" and "Butterworthing") the vessel's tanks (Deck Log, Exh. 22).

From the time when defendant's men arrived on board until after the explosion, plaintiff and its employees at no time failed or refused to provide any facility, equipment or service requested of any of them by defendant or any of defendant's employees (Lamanna, 3848).

During the night of December 23rd, defendant's mucker foreman, Hansen, boarded the vessel with a crew of sixteen men (Hansen, 450) and reported to Lamanna (id., 457).

During the evening of December 24, 1951, Allen, defendant's treasurer and manager of operations (Kennedy, 206) came aboard the vessel (Allen, 965–972). A considerable number of defendant's employees had quit work or had been discharged (Hansen, 458, 502); Lamanna had taken two employees from the mucking gang, in charge of defendant's mucker foreman, Hansen, and the latter had only seven muckers left (Hansen, 459; cf. Lamanna, 3840). Allen found that the mucking was considerably behind the washing (Allen, 844).

Prior to Allen's arrival, Shorrock had asked Lamanna whether defendant could obtain additional men from New York (cf. Hansen, 458). Lamanna deemed that impossible because the next day was Christmas (Lamanna, 3740, 3840). Lamanna inquired of Shorrock whether members of the ship's crew might be engaged to work as muckers during their off-duty time (id., 3740). Shorrock promised to see what he could do (id., 3841).

While Allen was on board the vessel in the evening of December 24th, he inquired of Shorrock whether defendant could engage crew members to work as muckers. Shorrock endeavored to reach plaintiff's office by telephone. When not successful in that telephone call, Shorrock consulted the master of the vessel, Captain Bird, who authorized defendant's employment of crew members during their off-duty hours, provided they were kept in separate gangs and their pay turned over to the master for disbursement to them (Shorrock, 322–324; Bird, 1355–1358).

Allen arranged through the ship's pumpman, Hobein, to engage crew members who were willing to work for defendant during their off-duty time; and he agreed to pay them at the rate of one dollar an hour for their services (Allen, 844, 969–972; Hobein, 1167–1171).

Allen placed all of the crew members so employed on defendant's pay roll, and subsequently charged plaintiff for their services at defendant's regular billing rate (Allen, 2340–2343; Exh. 11). Plaintiff's officers, who were similarly hired and paid by defendant, were under the direction, control and supervision of defendant. When such officers were so employed, they in turn gave orders to the crew members; and in so doing they were executing defendant's orders (Shorrock, 325, 1023–1027; Exh. 34).

Shortly after defendant began working, Shorrock informed Lamanna that tanks which had contained Kuwait crude oil could be washed more effectively with cold water than with hot water. Lamanna changed to cold water washing (Shorrock, 318–322).

Where tanks have contained Kuwait crude oil, cold water is at least as effective; and, in plaintiff's experience, had been more effective than hot water washing (Bird, 1365, Exh. 75; Shorrock, 1058–1059; Mercer, 4551–4552).

The need for ventilating the tanks after they have been washed and the

amount of ventilation required is substantially the same whether the washing is done with hot or with cold water (Mercer, 4530, 4547–4549; Murray, 6667–6670; Bird, 1336–1337; Shorrock, 1112–1113; Purdy, 3203–3204).

There was not, at any time, any order given by Shorrock or any other representative of plaintiff to Allen, Lamanna or any other representative of defendant with respect to whether defendant should use cold water or hot water or with respect to any other detail of defendant's work (Shorrock, 321–322; Allen, 972–978).

After Lamanna, defendant's general foreman, had caused the No. 4 port wing tank to be washed in the morning of December 25th, he inspected it on several occasions and was dissatisfied with its appearance; he considered that it might be mucked after a blower or windsail had been used in it (Lamanna, 3749–3753, 3825–3838). It does not appear, however, that he informed Hansen, defendant's mucker foreman, that he thought the tank would require further ventilation; and he could not remember whether the tank had theretofore been ventilated (3826); but, after his final inspection of the tank about 2 p. m., Lamanna told Hansen that the tank was finished (3827).

Cleaning operations had begun in the night of December 22nd, shortly after the vessel finished discharging cargo, and were continuously in progress down to the time of the explosion. The vessel remained at her discharge berth until 7:20 a. m. on December 24th, when she undocked with the assistance of a tug and proceeded to Marcus Hook, where she anchored at 8:41 a. m. (Deck Log, Exh. 22; Bird, 1348).

When it appeared that defendant's cleaning work was sufficiently advanced to be completed on the way to the Baltimore shipyard, the vessel left her Marcus Hook anchorage at 1:26 p. m. on December 25th, and proceeded down the Delaware River bound for Baltimore (Deck Log, Exh. 22; Bird, 1350–1351).

About 6 p. m. she encountered fog; and at 6:57 p. m., she dropped anchor in thick fog to the northwestward of Overfalls Light Vessel (Bird, 1382–1384).

It was the duty of defendant's mucker foreman, Hansen, no less than that of its general foreman, Lamanna, to determine whether the tank was in condition for mucking (Lamanna, 3830; cf. Doyle, 4398; Kennedy, 4659–4660).

After the No. 4 port wing tank had been washed, a windsail was rigged over the hatch, perhaps by or with the assistance of a member or members of the ship's crew; and a copus blower was put in the tank (Von Der Decken, 716–718; Doyle, 3683; Hansen, 468–469; cf. 532).

In addition to the two water blowers provided by defendant for ventilating the tanks (Exh. 66), four copus blowers and several windsails, all a part of the vessel's equipment, were available to defendant on request; and at least some of them were in use prior to the explosion (Bird, 1333; Shorrock, 423; Von Der Decken, 699, 717).

Neither Shorrock nor any other employee of plaintiff agreed, promised or undertook at any time to ventilate the tanks or to assume responsibility for anything else inherent in defendant's obligation to wash, clean and gas-free the vessel (Shorrock, 1138–1140, 1145–1146; Von Der Decken, 730; Bird, 1465, 1466, 1521–1522).

Members of the ship's crew employed by defendant were grouped in one and sometimes two gangs, depending on how many were off watch at the time (Hansen, 459). They reported to defendant's mucker foreman, Hansen, who gave them directions, as to which tanks to muck (Hansen, 462).

Between four and five o'clock p. m. on December 25th, a gang of off-duty ship's personnel, for whom Hobein was spokesman, reported for duty to Hansen, defendant's mucker foreman, who sent them to muck the No. 4 port wing tank (Hansen, 462; Hobein, 1171).

The gang of ship's personnel entered the No. 4 port wing tank and started mucking; shortly afterward they became dizzy; and one of their number had to be helped out of the tank (Hobein, 1171–1172; cf. Hansen, 462, 465).

Hobein reported to Hansen and Lamanna that the No. 4 port wing tank was gassy; Hansen remarked that Hobein's gang was not accustomed to gas; and he directed them to take the No. 5 port wing tank (Hobein, 1172; cf. Hansen, 464).

Hobein's gang entered the No. 5 port wing tank, as Hansen directed; but before doing any considerable amount of work, they found that tank also to be gassy and came out of it, Hobein telling Hansen that a windsail should be put in before his gang went in again (Hobein, 1172–1173; cf. Hansen 465).

After Hobein's gang came out of No. 5 port wing tank, and complained of its condition to Hansen, the latter directed them to take the ballast tanks, which run athwartship immediately after of the No. 5 tanks (Hansen, 466–467; Exh. 13; Hobein, 1173).

The explosion occurred about 8:05 p.m. on December 25, 1951, while the Bulkpetrol was anchored in fog off Overfalls Light Vessel in Delaware Bay (Deck Log, Exh. 22; Bird, 1355, 1359, 1381–1384; Exh. D).

A few minutes before the explosion, Ohlsen and Hofstetter, two of defendant's employees, at the direction of Hansen, their foreman, entered the No. 4 port wing tank, taking with them one of defendant's Russell and Stoll drop lamps, which was suspended by its conductor cable and had a guide line attached to it so that the men below could move it laterally in the tank (Hansen, 476–479; Lane, 3981–3982; Hobein, 1174–1175, 1182).

The two men entered the tank through a small hatch on the deck, from which a steel ladder led almost perpendicularly to the bottom of the tank, 44 feet below. There were numerous steel beams in the tank, three of them running athwart the tank less than four feet from the face of the ladder (Court's Exh. II; Joyce, 2681, corrected at 5411, and see 6843, 6847, Exh. 172).

The cable to the lamp was being handled from the deck by one of defendant's employees named Israelson (Hansen, 475; Israelson, 2483–2485).

Rain, sleet or snow was falling. While the foreman in charge was giving his attention to covering defendant's junction box, where the cable to the drop lamp was plugged, the explosion occurred (Hansen, 476, 482, 485–486), killing Ohlsen and Hofstetter, the two men in the tank, injuring other of defendant's employees on deck, and doing substantial damage to the vessel.

According to defendant's general foreman, Lamanna, he had washed the tank with cold water early in the morning of the 25th, had inspected it at 10 a.m., at noon, and at 2 p.m., and after his last inspection had turned the tank over to his subordinate, the mucker foreman, in the belief that it would be ready for mucking in about two hours (Lamanna, 3749–3753, 3825–3838).

The mucker foreman, Hansen, whose duty it was to determine when the tank was in condition for mucking (Lamanna, 3830; cf. Doyle, 4398; Kennedy, 4659–4660), testified that he had inspected the tank about 3 p.m. (468). As already pointed out, between 4 and 5 p.m., he directed a gang of off-duty crew members (hired by defendant) to work in the tank; but after working a short while the gang came out and reported the tank to be gassy (Hansen, 462–465; Hobein, 1171–1172). Thereafter, Hansen inspected the tank again, by smelling it. He had used a gas tester on other ships, but he did not use or ask for one on the Bulkpetrol (471), although the vessel's gas tester was available on request (Shorrock, 419, 421; Bird, 1371–1372; Von Der Decken, 755–756; cf. Lamanna, 3855–3856).

Hansen found the tank, "Not good but not bad enough not to be mucked. It didn't smell too bad" (473).

Both windsails and blowers were at hand for ventilating the tank (211–214); in fact, Hansen testified that he may have removed a windsail from the tank when he inspected it about 3 p.m. (468–469, 526); but, upon his final inspection, he decided that further ventilation was unnecessary or useless until after the tank had been mucked (473).

When the smoke cleared from the vicinity of the hatch, and while the injured men were receiving attention, it was discovered that the ladder was gone and that the side of the ship in the way of the tank had been blown off. The bottom of the tank was filled with the wreckage wrought by the explosion and there was no sign of the two men who had been there. The cable to the drop lamp was hanging in the hatch, but the lamp was gone, the lower end of the cable broken (Shorrock, 343; Hobein, 1178–1179; cf. Hansen, 523).

The vessel obtained a pilot and proceeded back to Marcus Hook, anchoring on the way for several hours, presumably on account of fog, and arriving at Marcus Hook at 9:10 a.m. on the 26th (Deck Log, Exh. 22).

Israelson, the man handling the lamp cable at the time of the explosion, had been injured, mainly by the concussion through the deck (2490–2500). He had been taken to a bunk in the officers' quarters, where he was administered aspirin and whiskey (Shorrock, 422). Upon the vessel's arrival at Marcus Hook, he was removed to a hospital in Chester (2493–2494).

Defendant's managing officers, Allen and Kennedy (4631) arrived from New York after learning of the explosion, and boarded the vessel at Marcus Hook about 2 p.m. on the 26th, taking with them or being joined there by an attorney (Allen, 854–855, 896, 911; cf. Kennedy, 246).

They interviewed defendant's foremen and other employees. They examined what was pointed out to them as the cable from which defendant's droplight had been suspended in the tank (Allen, 855, 896, 898, 916–923, 957–958; Kennedy, 2625–2639). Later in the day, Lane, defendant's maintenance manager, who was in charge of all of defendant's electrical equipment (and who had come by truck from defendant's headquarters in Bayside, New York, bringing two other workmen and a load of additional equipment) arrived on the vessel. Allen and Kennedy showed him the broken cable, which he examined. At their direction, he cut notches in it for identification purposes. When he left the vessel next evening, he took the cable with him. All three of those witnesses identified the cable as Exhibit 69 (Allen, 916–924, 943; Kennedy, 2637–2638; Lane, 3963–3965).

In investigating the circumstances of the explosion, Allen heard that Israelson was reported to have made a statement describing the occurrence (2283–2296; Hansen 489). Accompanied by an attorney, Allen visited Israelson in the hospital about one o'clock in the morning of the 27th and took a written statement from him (Allen, 2292–2296).

On the 26th and 27th, one of plaintiff's attorneys boarded the vessel to investigate the casualty; he took a statement from defendant's mucker foreman, Hansen; and on the 27th, after Israelson had been visited by Allen and defendant's attorney, he also took a statement from Israelson in the hospital (2543).

Defendant resumed work on the 26th, the day after the explosion. In the afternoon of the 27th, defendant was notified that the vessel would shortly get under way for Baltimore, and that the cleaning which remained to be done would be completed by the shipyard. Accordingly, defendant was instructed to remove its men and equipment; and it did so (cf. Kennedy, 4658; Lamanna, 3743–3744).

Meanwhile, on the 27th, plaintiff informed defendant by telegram that the latter would be held accountable for the damage done by the explosion (Kennedy, 243).

On arriving at the Bethlehem shipyard, the vessel was moved to a floating dock in the morning of January 2nd; her

No. 4 tanks were pumped out; and at 6 p.m. on that day the bodies of the two missing men, Ohlsen and Hofstetter, were removed by a police boat. At 11 a.m. next day, the vessel was refloated. In the morning of January 4th, she was shifted back to a floating dock and her No. 4 tanks were again pumped out by the shipyard (Deck Log, Exh. 22).

On January 5th, the remains of a drop lamp, from which a broken piece of cable protruded, were recovered by a shipyard worker in the No. 4 port wing tank and were handed over to one of plaintiff's proctors (Chester, 106, 116, 121–122).

The identity and defendant's ownership of the drop lamp were thoroughly established. Allen, Kennedy and Lane engaged in numerous equivocations in an effort to avoid a frank admission of its ownership (cf. Allen, 899, 904–909, 910, 916–926, 939–943, 2304–2312, 2314, 2317–2327; Kennedy, 261, 222–224, 2623–2624, 3319–3320, 4700–4711; Lane, 3985–3990, 4054–4059).

The Court also regards as unworthy of belief other testimony offered by defendant in an effort to discredit the authenticity of the lamp—the testimony of Foley (that Exhibit 3–A was the base of a 100-watt bulb, whose condition could be reproduced by throwing a bulb in the fire [4836–4837, 4861]), and the testimony of Katsigris (5589–5595) that he had found on the Bulkpetrol, over five years after the casualty, a 30-foot coil of cable, identical with Exhibit 69, the 57-foot length of cable which defendant had removed from the vessel. The testimony of these two witnesses was manifestly unreliable (Foley, 5108–5113, 5162–5164, 5167–5168, 5252–5253; Katsigris, 5699–5705; see 5738–5843, 5763–5764, 5803–5808).

The lamp (Exh. 3 and its appurtenances), as well as the cable (Exh. 69), were examined at the New York Testing Laboratories in the presence of representatives of both parties. Horvitz, the technical director of the laboratory, and Stewart, its chief engineer, testified at the trial. They expressed the opinion that the explosion was caused by the breaking of the Pyrex glass bowl and the glass envelope of the bulb, thus exposing the burning filament to a gaseous and explosive atmosphere (Horvitz, 2854–2854a, 2893, 2915, 2951; Stewart 3040).

Horvitz and Stewart stated that the primary reasons for their opinion were: the presence of the metallic globules in the Edison base; the boule at the end of the lead wire; and the almost complete absence of glass within the Edison base (Horvitz, 2847a, 2854–2854a, 2855, 2893, 2915, 2959; Stewart, 3372–3373, 3377).

Because definite indications of arcing between the mutual ends of the cable conductor wires on Exhibit 3 and those on Exhibit 69 (where the wires were parted) were absent, Horvitz and Stewart expressed the view that the circuit had been broken *before* the tensile break in the cable occurred, but *after* the explosion had been set off and *after* the flow of current had been stopped by the destruction of the filament (Horvitz, 2800–2801, 2803, 2902–2903, 2937a; Stewart, 3380).

The Horvitz-Stewart testimony impressed the Court as clear, reliable and convincing. The Court finds, as a fact, that the explosion was caused by the factors and under the circumstances encompassed within the Horvitz-Stewart theory of the cause of the explosion.

The Horvitz-Stewart theory takes on the added dimension of reality when considered in the full context of the detailed evidence with respect to the internal structure of the tank and the conduct of three of defendant's employees— Israelson, Ohlsen and Hofstetter—a few minutes before the explosion.

In behalf of plaintiff, a naval architect identified the plans of the vessel, including plans of the No. 4 port wing tank (Joyce, 5411).

At the Court's suggestion, a scale model of the tank was constructed and put in evidence as Court's Exhibit II (4416, 4419). This model of the tank is most illuminating. When that model

is viewed in conjunction with the testimony contained in the Israelson deposition (2479–2501, 2508–2564) the concatenation of incidents leading to the explosion is discernible.

The No. 4 port wing tank contained twelve wide, lateral, "H" steel beams (stiffeners), shown in yellow on Court's Exhibit II; eight of these beams are diagonal; four of them are horizontal. An almost vertical, forty-foot steel ladder, runs from the hatch of the tank to the bottom of the tank. The ladder is shown in green on the model. The ladder extends from the inboard side of the tank to a point directly underneath the hatch opening to the tank. The ladder is held firm by four sets of steel brackets. The ladder is located between two sets of the lateral steel beams, so that the space between the planes of the two sets of lateral stiffeners is divided almost in half by the ladder.

In addition to the foregoing steel structures, there are four horizontal, longitudinal, right-angled steel beams. These are shown in coral color on the model. There are longitudinal steel beams running fore and aft on the bottom and outboard side of the tank, shown in black. One of these longitudinal beams shown in coral, runs fore and aft along the centre line of the bottom of the tank, rising to a height of about four feet from the bottom of the tank. The major frame of the tank consists of eight steel members, shown in white. These eight members extend into the tank from the sides, top and bottom of the tank.

Thus, while the tank may be conceived as cargo space for oil, it is not "empty" space, even when the oil cargo has been discharged. The variously located steel structures protruding into and traversing the inside of the tank present a large number of steel surfaces and edges.

Even if the effect of the oscillation of the anchored vessel (Sheridan, 6441, 6447, 6448, 6451; defendant's attorney, 6444) were to be discounted, a person of ordinary prudence would recognize that when a droplight (consisting of a long, flexible cable and an attached electric bulb and an outside glass bowl) is lowered from the hatch opening into the tank, there is great likelihood that the droplight will come in contact with one or more of the steel surfaces or edges.

This probability of contact between the freely suspended droplight and one of the steel structures is increased by the very use to which the droplight is put. There are no electrical fixtures inside the tank. The muckers who work inside the tank are compelled to use either hand flashlights or a 200-watt droplight.

Attached to the droplight is a guide rope or lanyard, about 18 feet long (Hansen, 476–479). This guide rope is used by the muckers to move the suspended droplight laterally to various positions within the tank, which is between 40 and 50 feet long and almost as wide. In moving the suspended droplight laterally, the muckers must pull the droplight by means of the guide rope. In order to avoid smashing or fracturing the droplight, it must be carefully raised or lowered and moved laterally over and around or under the criss-crossing and protruding steel structures. If one of the muckers holding the lanyard should slip on the oily surfaces or be overcome by toxic gas and thus abruptly pull or let go of the guide rope, the droplight would very likely smash against one of the steel structures. So, too, if the man raising or lowering the droplight from the hatch opening should raise or lower it at a time when the droplight is not in a position free and clear of the steel structures, there is danger that the droplight would be smashed or fractured.

Ordinary prudence dictated that the Pyrex glass bowl should be periodically inspected to see that it is not scratched, split, abraded or otherwise weakened. Defendant did not make such inspections. In addition, ordinary prudence dictated that there should be a non-sparking metal cage or guard over the glass bowl of the droplight. Defendant failed to pro-

vide such guards. The expected happened: an explosion.

It is undisputed that tank-cleaning and gas-freeing is a known dangerous operation at all times (1395, 1345, 1507, 1508); and defendant has admitted that fact unequivocally (defendant's main posttrial brief, 104, 122, 133). But, if appropriately proper care is taken there will be no explosion.

Israelson's deposition was taken at Ellis Island by plaintiff on November 19, 1952, while Israelson was awaiting deportation (2479). Israelson had theretofore commenced an action against plaintiff to recover damages for his personal injuries.

Israelson's deposition was read into the trial record without objection (2479–2501, 2508–2564, 2568).

Israelson was working as a mucker for defendant on December 25, 1951 (2481, 2554). His foreman was Hansen (2482, 2501).

In his deposition, Israelson testified that, at the time he was hurt, he was standing between the hatch and one of the valve wheels inboard of it (2481–2482); he was looking down the hatch, facing outboard, looking a little forward and out (2540).

His account of his prior activities and observation included the following sequence of events:

1. At Hansen's direction, he picked up the lighted drop lamp, took it over to the hatch, and lowered it a few feet (2483–2485). Hansen told him what lamp to take.

2. Hofstetter then went down to the bottom of the tank (2485).

3. Israelson "lowered the lamp to him [Hofstetter], about half-way down; about 20 feet down in the tank" (2485–2486, 2518).

4. Hofstetter "went forward on the beam" about "four feet from the bottom" of the tank (2486).

5. Ohlsen descended the ladder part way, stopping to help Hofstetter "clear the lamp past one of those beams, cross-ed, you know, in the middle of the tank. He was helping him clear it over" (2486–2487, 2537–2538). Ohlsen and Hofstetter had flashlights, but Israelson did not remember whether they turned them on (2518).

6. After guiding the lamp around the beam (2518), Ohlsen continued down the ladder and onto the beam "about four feet from the bottom" of the tank; "he went a little forward"; then he got down on the steam coils (2487, 2520–2521, 2538), and walked aft toward the ladder (2521, 2548–2549), "holding his hand on the beam down in the tank" (2521).

7. Meanwhile, Israelson lowered the lamp a little farther, until it was about "ten to eight feet from the beam down there" (2520, 2518–2519, 2521–2522), the beam that Ohlsen had his hand on (2561). Israelson secured the conductor cable to the dog on the side of the hatch coaming (2488, 2520, 2538–2539, 2542).

8. Ohlsen was "working a little backwards to the ladder on the steam coils," which were "slippery," and "he was walking with his hand on the beam" to steady himself (2488, 2548–2549).

9. Israelson asked Ohlsen whether the light was all right, whether he wanted it lowered or raised. Ohlsen told Israelson to raise it a little (2521, 2522, 2534). Israelson thought he was supposed to open up the dog on the hatch coaming in order to raise the lamp (2522).

10. Ohlsen "was on the coils. He was pretty close to the ladder" (2521). Ohlsen "was a few feet forward of the light, a little forward, but he was, I don't know, ten or less, six or seven feet or less from the lamp" (2546).

11. Israelson did not remember (2501) whether there was a guide rope on the lamp, but if it was there, it would have hung down (2536).

12. As the lamp was hanging, the nearest object was a heavy big steel beam going up and down in the tank (2533).

13. Israelson could not remember whether Ohlsen had hold of the light cord

(2546), but the lamp was out of Ohlsen's reach; about six or seven feet over his head (2546). "About four, three or four feet over his head" and Ohlsen tried to reach for it (2562, 2558, 2558a).

14. Before (2534) he could open the dog preparatory to raising the lamp (2523) Israelson saw Ohlsen "move his hand like—I don't know if he grabbed it or what. I am not sure if he put his arm out." "It looked to me like he slipped, yes." "I saw the red blast coming up. It went so quick. I can't say exactly what it was, a red blast coming up, you know" (2489, 2545, 2547, 2563, 2522). "I say it looked to me like he grabbed up. If he fell or grabbed for something" (2559).

Israelson did not recall whether he had his hand on the cable at the time Ohlsen slipped and grabbed for the lamp (2545; 2588). He said he did not raise the cable before the explosion (2547). However, Runge, the third officer of the vessel, who was on the bridge when the explosion occurred, testified that he saw one of defendant's men at the No. 4 port wing tank with his hand on the cable, pulling the cable out of the tank (3408, 3411, 3420, 3442–3443); and *at the same time* he pulled on the cable the explosion happened" (3408, 3420). The Court accepts this testimony by Runge as a truthful account of what occurred.

■ The fact that plaintiff introduced Israelson's deposition does not mean that plaintiff is bound by everything that is contained in that deposition. The Court may accept or reject any or all parts of the deposition, depending upon what the Court believes. Johnson v. Baltimore & Ohio R. Co., 3 Cir., 1953, 208 F.2d 633. The Court does not believe Israelson's testimony that he did not raise the light (2534); nor does the Court believe Israelson's testimony (2501) that he did not remember whether there was a guide rope on the lamp. The testimony of Hansen, Lane and Hobein established that a guide line about 18 or 20 feet long was attached to the droplight (476, 479, 1174–1175, 1182, 3981, 3982, 4145). The Court rejects Israelson's testimony that

the droplight was motionless (2533–2535).

Five minutes had elapsed between the time Israelson had lowered the light and the explosion (2501).

If the basic facts in the Israelson deposition are combined with the structural facts of Court's Exhibit II (the tank model) and Runge's testimony, the incidents immediately preceding the explosion form the following narrative:

After Israelson had lowered the lamp a little way, Hofstetter went down the ladder. While Israelson continued to lower the lamp, Ohlsen followed Hofstetter down the ladder but paused opposite the horizontal stiffener, about half way down the tank, to pass the drop lamp over it. The stiffener is close to the ladder, well within the reach of a man holding to the ladder with one hand.

Hofstetter stepped from the ladder to the longitudinal beam about four feet above the bottom of the tank and about three feet from the ladder.

While Hofstetter was in that position, Ohlsen assisted him in clearing the lamp around the stiffener. That operation took place considerably above Hofstetter's reach and, therefore, Hofstetter participated in it by holding the guide rope, which was eighteen or twenty feet long.

After the lamp had been cleared, Ohlsen went on down the ladder. Israelson paid out cable until the lamp was a few feet over the longitudinal beam on which Hofstetter was standing at the bottom of the tank. Israelson secured the conductor cable with a clove hitch around the dog to the hatch cover.

Ohlsen proceeded forward a little way on the longitudinal beam at the bottom of the tank. Hofstetter, by that time had gone to the forward part of the tank.

Then Ohlsen stepped down onto the slippery steam coils. He walked back toward the ladder (2549). He steadied himself with one hand on the beam.

When he lacked a few feet of being directly under the lamp, he asked Israelson to raise it. At that time, the lamp

was about 3 or 4 feet over Ohlsen's head. It was in the vicinity of the lower diagonal stiffener. The vessel was down by the stern some 20 feet (Deck Log, Exh. 22). The lamp had to be steadied by means of the guide rope while it was being raised by Israelson.

Ohlsen grasped the guide rope to save the lamp as Israelson raised it. At the same moment, Ohlsen was dizzy and, becoming asphyxiated by gas which he had been breathing for several minutes, fell. The lamp hit a nearby steel structure. The Pyrex glass bowl cracked or smashed; the electric bulb inside the bowl broke; and the incandescent filament was exposed to the explosive gases. There was an explosion.

The evidence established that the Pyrex glass bowl on defendant's droplight was critically weakened by surface abrasions and subject to easy fracture by the force of the impact of a relatively small swing of the suspended droplight against one of the nearby steel structures in the tank. The evidence also established that defendant's managers were culpably ignorant of and recklessly indifferent to that condition.

Plaintiff's expert, C. J. Phillips, a highly qualified authority on Pyrex glass, testified that he had conducted, at plaintiff's request, a series of experiments to determine how and under what condition bowls of the type in question, mounted in a fixture similar to Exhibit 3, would break under impact (2175–2176). These experiments and the results obtained were testified to in detail (2180–2232). Of demonstrated significance to the case at bar is the fact that, where the bowls had been abraded and scratched, they were greatly weakened; that, if the fixture were allowed to swing freely at the end of a 20-foot rope, the bowl would shatter on impact against the edge of steel blade an inch thick only 3 or 4 feet away (2189); that, if the fixture were swung with greater force than is provided by gravity alone, the bowl would break on impact at a proportionately shorter distance (2200–2202).

A particularly salient finding reported by Phillips was that, when a sound bowl is subjected to impact, a fracture may occur at the lip or flange, where the bowl is set between the globe ring and the retaining ring. Such a fracture may remain undetected *unless* the retaining ring is removed and the globe taken out. After suffering such a fracture, the strength of the bowl is drastically reduced—a slight impact may be sufficient to destroy it (2209–2232; cf. Exh. 88).

Various publications by the manufacturer of the bowl have indicated the need for protecting the surface of Pyrex glass from abrasion; the information is common knowledge among industrial users of such glass (2282). A metal guard serves to protect the bowl from abrasion. The bowls should be inspected periodically (2280–2282).

The above basic information about Pyrex glass bowls and the correlative safeguards were either negligently, unknowingly or recklessly disregarded by defendant. On this point the evidence is overwhelmingly against defendant.

Allen and Kennedy, defendant's managers; and Lane, in charge of defendant's electrical equipment (4627–4628, 4631) were of the asserted belief that the incandescent bulbs were adequately protected by the Pyrex bowls alone (Allen 947–950; Kennedy, 258–259, 4627, 4628, 4631; Lane, 4158, 4159).

Lane, defendant's manager in charge of inspection and maintenance of defendant's electrical equipment, admitted that, during the five years he worked for defendant, he had never replaced a single Pyrex glass bowl on defendant's Russell and Stoll droplights (4137). Lane had seen all sorts of scratches on the Pyrex glass bowls on defendant's droplights (4127, 4138–4139); but, as he had no knowledge whether the scratches affected the strength of the bowl (4138), he never rejected a Pyrex glass bowl for use, even though it might be heavily scratched (4139). Lane attached no importance to the scratches he

had observed on the bowls (4034–4035, 4127), nor to the fact that the metal portion of the droplights had been dented in service (4127–4128).

According to Lane, about fifteen lamps of the type in question (out of some twenty of that type owned by defendant), were actually serviceable in December 1951 (3929). So far as he recalled, no bowls on lamps of that type had ever broken or been removed from their rings for inspection (4035–4036). Lamps of another manufacturer, having slightly shorter bowls, were subjected to about the same usage as those of the type in question; and the bowls on those lamps had broken frequently (4024, 4121, 4137).

Not only were critically weakened Pyrex glass bowls negligently used by defendant, but defendant also negligently failed to use non-sparking metal guards or cages over the glass bowls. Lane's testimony with respect to the subject of metal guards reveals the following facts. Defendant never used metal guards on any of its Russell & Stoll lights (4122, 4126). When guards were furnished by the manufacturer of the lights, defendant would remove the guards (3928–3929, 4122, 4129).

Lane himself equivocated as to the protective value of metal guards. On the one hand, he testified that he "understood they [non-sparking metal guards] would be a protection" and that one of the safety features would be a guard (4123, 4125). In line with this testimony, he said, "Yes, I thought they really should have guards" (4126); and *"Sometime in 1950" he told Allen that he thought that defendant ought to have guards on these droplights but nothing was done about it* (4125, 4126); and that defendant never tried to make its own non-sparking guards (4133).

On the other hand, Lane testified that "the glass seemed much heavier than the guard" and "we thought that the glass itself was so strong that the guards actually didn't serve too much of a purpose" (4158, 4159).

What the Court regards as the true reasons for defendant's deliberate and negligent failure to use metal guards over the glass bowls finally emerged from Lane's testimony when the Court questioned Lane: first, a number of the metal guards would crack or break in use and defendant wanted to save the expense of replacing the guards (4158, 4159); and, secondly, defendant did not want to go through the bother of screwing guards on the lamp fixture when the screw "threads" on the fixture had "become damaged" and "there would be some difficulty in putting the guards on" (4159).

With specific reference to the droplight used in the tank just before the explosion, Israelson testified that there was "no metal protector frame over it" (2544).

That metal guards may not have been used by some of the other tank-cleaning companies is relevant and admissible as tending to prove a customary practice of the industry, but defendant's standard of care in a negligence action "is not limited to complying with usual practices in the industry or trade." Troupe v. Chicago, etc. Transit Company, 2 Cir., 1956, 234 F.2d 253, 260.

In this case, it was clearly negligent for defendant to have used the droplight in the tank without a metal guard (see Shorrock, 369–370). Such negligence, in violation of defendant's duty of care toward plaintiff, was an ingredient of the proximate cause of the explosion.

The Court finds that defendant was negligent in failing to exercise reasonable care in the inspection and maintenance of its electrical equipment, including its droplight represented by Exhibit 3, in that, having been subjected to hard usage for a period of more than two years, the bowls on all of defendant's lamps of that type had become scratched, abraded and probably fractured, so that their resistance to ordinary impacts was greatly impaired; and in that no metal guards were provided by defendant to

protect its droplights from abrasion and from breaking on expectable impacts inside the tanks (Lane, 3928–3929, 4034–4035, 4138–4139, 4125–4126, 4035–4036, 4017–4019; Allen, 947–950, 996–997, 894–894a, 895–896, 2335–2336; Phillips, 2187–2188, 2205–2206, 2208–2218, Exh. 88; Kennedy, 258–259).

Defendant's negligence in its faulty methods and inadequate equipment is further illustrated by the sort of lanyards which were used on this job. As already noted, a lanyard was used as a guide rope on the droplight to move it laterally inside the tank (4145, 4174–4180, 4190, 4195). A droplight weighs about twelve pounds. It had to be pulled over and around the steel beams inside the tank. But in its foolhardy economy, defendant bought second-hand rope, which was 75% cheaper than new rope; and this rope was never tested by defendant to see how strong it was (4146, 4147).

Even more condemnatory is the evidence on the subject of gas meters. At one time, about 1948, defendant had a gas meter, but when it broke, defendant did not replace it (Lane, 4154; Kennedy, 4677). Contrary to proper methods (Bird, 1517), defendant did not test the tank with a gas meter to ascertain whether the tank had gas in it or whether it was explosive or otherwise dangerous (Walling, 4296). Although there was a gas meter on the vessel (Runge, 3441), defendant did not take the trouble to borrow and use it.

Kennedy, one of defendant's chief representatives, admitted (2601) that defendant's method of determining whether there is a dangerous concentration of gas in a tank is "by the smell of the tank." He was aware of the fact (2602) that the two primary hazards with the concentration of gases in a tank are the toxic condition as it affects the men working in the tank and the explosive quality of the gas vapors.

Kennedy admitted that defendant's test of explosibility was whether a man could work in a tank from one-half to one hour without danger to himself.

(2602–2603). He further testified that "a concentration of 50 percent of a lower explosive range of a mixture of gas, vapor and air, will be sufficient to make a man unsteady on his feet and dizzy within a comparatively short time, within a range of five or ten minutes" (2603).

It will be recalled that the explosion took place within almost five minutes after Ohlsen and Hofstetter went into the tank, and that Ohlsen was unsteady on his feet and appeared to be falling. Defendant negligently failed to use a gas meter to test conditions in No. 4 port wing tank for toxicity and explosibility before sending Ohlsen and Hofstetter into the tank and lowering the droplight in the tank.

We must, of course, consider the record in the light of the general state of knowledge which "reasonable minds" would possess. On this record, the conclusion is inescapable that the tank contained gas which was toxic and explosive. Cf. Gulf Oil Corporation v. Wright, 5 Cir., 1956, 236 F.2d 46, 49; United States v. Marshall, 9 Cir., 1956, 230 F.2d 183, 190.

In view of the common knowledge and general scientific and technical information of gases in tanks which contain or contained crude oil, there is no doubt about the fact that defendant knew of this hazard; and that defendant violated the standard of care which it was required to observe.

Defendant was conscious of the danger of exposing a burning filament in the tank. All of defendant's asserted vigilance to provide explosion-proof, spark-proof equipment—going to the length of eliminating steel guards from its lamps—would have no meaning whatsoever outside the context of defendant's complete awareness of the expectable consequences of exposing a flame, or even a single spark, to the atmosphere of a tank that had not recently been tested and properly determined to be gas-free.

Notwithstanding its awareness of the foreseeable risks, defendant negligently suspended its unguarded drop lamp, with a lanyard or guide line attached, so that—through the actions of

the man (Israelson) handling the cable or the actions of a man (Ohlsen or Hofstetter) in the tank—the lamp might expectably strike against a steel member in the tank with sufficient force to fracture the bowl and bulb and thereby expose the burning filament to the explosive atmosphere of the tank.

Moreover, the Court finds that there is no evidence that either Israelson or Ohlsen qualified by experience or instruction in the handling of droplights; and neither Hansen nor Lamanna, their foremen, properly supervised the handling of the droplight in the tank (Hansen, 476, 485–486).

The finding definitively established by the credible evidence is that the explosion was triggered by the breaking of the unguarded Pyrex bowl on Exhibit 3 and the exposure of the filament of the incandescent bulb, the base of which is Exhibit 3A (Horvitz, 2854–2854a, 2893, 2915, 2937a, 2951; Stewart, 3040, 3332–3335).

At this point, it seems appropriate for the Court to articulate some of the premises underlying its approach to the evidence.

In analyzing this record, the Court has sorted out the facts from the guesses. See Matter of Knetzer, 7 Cir., 1956, 229 F.2d 232, 237. And in determining what inferences from the known data "are common sense under the circumstances," the Court has borne in mind Chief Judge Clark's observation: "Judges should not be more naive than others, including jurors." United States v. Masiello, 2 Cir., 1956, 235 F.2d 279, 284, 285.

■ As fact-finder, the Court is thus required to select from the entire record those logical inferences which accord with common sense and experience and which fall within the normal range of probabilities in the context of the totality of the evidence.

■ The standard of plaintiff's burden of proof in this non-criminal case— " 'by a preponderance'—means that the inferences from the testimony are such as to persuade that the occurrence of an essential fact was *more likely or probable* than its non-occurrence." Judge Frank, concurring, in United States v. Masiello, 2 Cir., 1956, 235 F.2d 279, 286. (Emphasis in original.)

This is not the case where plaintiff has "erected a rather shaky edifice of actual negligence upon the shifting sands of carelessness inferred from the naked accident," although the substantial evidence herein does require "a broad bridge of inference to permit the conclusion of actual negligence." Cf. Lee v. Pennsylvania R. Co., 2 Cir., 1951, 192 F.2d 226, 228.

The circumstantial evidence adduced by plaintiff herein permits rational and logical inferences in favor of plaintiff's factual contentions. The Court has drawn such inferences. Such inferences are not speculative or conjectural.

■ In this Circuit, the courts have "unequivocally rejected the view that circumstantial evidence is probatively inferior to direct evidence and that its sufficiency is, therefore, to be determined by a different, more stringent test than is applied to direct proof." Judge Medina, in United States v. Brown, 2 Cir., 1956, 236 F.2d 403, 405. See discussion in F. A. R. Liquidating Corporation v. Brownell, D.C.Del.1956, 140 F.Supp. 535, 539–540.

■ In an explosion case, where a plaintiff's evidence shows two or more equally possible causes of an explosion, for one of which defendant would be liable, but for the others of which defendant would not be liable, plaintiff is deemed to have failed to carry its burden of showing that the explosion occurred from a cause for which defendant would be liable. Soso v. Atlas Powder Company, 8 Cir., 1956, 238 F.2d 388. In that situation, the evidence is said to be equivocal because it supports two or more *equally consistent* possibilities or hypotheses of causation (all of which are "scientifically possible"), thereby leaving the fact-finder (jury or judge) to choose one of the possibilities "by guess and conjecture." Soso case, supra, at pages

389, 393–394; cf. United Geophysical Company v. Vela, 5 Cir., 1956, 231 F.2d 816, 822. As was said by Crouch, J. in Tortora v. State of New York, 1935, 269 N.Y. 167, 170, 199 N.E. 44, 45:

> "In all such cases the balance of probabilities between causes which entail liability and others which do not is equal enough so that an inference of fact which entails liability is the result of mere speculation."

█ So, too, a plaintiff does not prove a *prima facie* case where the accident with equal reasonableness might have been accounted for on a theory that did not entail negligence on defendant's part. Cardinale v. Union Oil Company, D.C.N.D.Cal.1956, 136 F.Supp. 487; The Ingrid, 2 Cir., 1914, 216 F. 72, L.R.A. 1916B, 716; Scharff v. Jackson, 1916, 216 N.Y. 598, 111 N.E. 242, dist. in Ingersoll v. Liberty Bank of Buffalo, 1938, 278 N.Y. 1, 8, 14 N.E.2d 828; Midland Steamship Line v. The Arkansas, 6 Cir., 1956, 232 F.2d 81.

█ The same result is reached where equally "expert" testimony is given by plaintiff's and defendant's expert witnesses, one sponsoring a "theory," which, if correct, would support defendant's negligence and consequent liability, and the opposing expert sponsoring a "theory" which, if correct, would disprove defendant's negligence as a cause. Where each of such theories is equally plausible and where "the trial judge could not find whether either theory as to the cause of the fire was the correct one, or what did in fact cause it," the Court will not rely on "speculation" but will find for defendant. Hoskyn & Co. v. Silver Line, 2 Cir., 1944, 143 F.2d 462, 464.

The evidence in the present case is not in a state of equivocation or equipoise. The Court is *not* here confronted with two or more possibilities or hypotheses of causation *equally consistent* with the total evidence or with conflicting expert testimony given by equally qualified experts. The weight of the credible evidence establishes that defendant's negligence was the actual cause of the explosion.

Recognizing that there "is no litmus test for finding what is true or false" (Goodrich, C. J., in Johnson v. Baltimore & O. R. Co., 3 Cir., 1953, 208 F.2d 633, 636), the Court here finds that the rational inferences establishing the actual cause of the explosion, as claimed by plaintiff, outweigh the conjectural possibilities of there having been some other cause out of a thousand possibilities. "The laws of logic as applied to evidence recognize the distinction between a possibility and a probability." F. A. R. Liquidating Corporation v. Brownell, supra, 140 F.Supp. at page 540. That defendant suggests that there may be many "scientific possibilities" or "theories" as to how the explosion was caused does not insulate defendant against liability where, as here, plaintiff has sustained its burden of proving by a preponderance of the credible evidence that the cause assigned by it did actually operate to bring about the explosion.

To the extent that the evidence relied on by defendant suggests multifarious "possibilities" of causation, the suggestions give rise to inferences whose probative weight is definitely overbalanced by the other and countervailing inferences clearly establishing defendant's negligence in connection with the droplight, Exhibit 3, and the related causative circumstances.

"Fact finding does not require mathematical certainty" and fact finders "are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn." Schulz v. Pennsylvania Railroad Company, 1956, 350 U.S. 523, 526, 76 S.Ct. 608, 610, 100 L.Ed. 668.

"Inference is never certainty, but it may be plain enough to justify a finding of fact." Crouch, J., in Tortora v.

State of New York, 1935, 269 N.Y. 167, 170, 199 N.E. 44, 45.

 In accident cases, where no one saw the accident, the evidence is, nevertheless, submitted to the jury for it to determine whether the defendant was negligent and whether defendant's negligence caused the accident when well-grounded inferences are possible from the evidence, although the inferences to be drawn from the circumstances cannot be said to be certain or incontrovertible. Tortora v. State of New York, supra; Sackheim v. Pigueron, 1915, 215 N.Y. 62, 67, 109 N.E. 109. In such cases, it is held that plaintiff's burden to prove defendant's negligence and proximate cause does not mean that plaintiff's evidence must exclude or eliminate every other possible cause. Ingersoll v. Liberty Bank of Buffalo, 1938, 278 N.Y. 1, 14 N.E.2d 828.

In the case at bar, plaintiff has affirmatively shown facts and circumstances which fairly and reasonably lead to the conclusion that defendant was negligent and that defendant's negligence was the proximate cause of the explosion.

In so finding, this Court is acting upon "the definite and firm conviction" that such are the facts and not merely because "there is evidence to support" such finding. Cf. United States v. U. S. Gypsum Co., 1948, 333 U.S. 869, 895, 68 S.Ct. 788, 92 L.Ed. 1147.

The Court now turns to Exhibit 3, the droplight, and Exhibit 69, the long length of cable. The Court finds that Exhibit 3 and its appurtenances are the remains of defendant's droplight that was used by defendant in the tank at the time of the explosion; and that the portion of cable protruding from Exhibit 3 was parted from Exhibit 69 during the explosion (Allen, 903, 941; Stewart, 3015, 3017; Hobein, 1186–1187; Lane, 4050–4051).

Because defendant has rather bluntly suggested that Exhibit 3 was "planted" after the explosion in the debris in No. 4 port wing tank, it is helpful to consider the testimony of Joseph Chester, an acetylene burner working for Bethlehem Steel Co. According to Chester, on January 5, 1952, he was removing damaged scrap from the Bulkpetrol while it was at the Baltimore Shipyard of Bethlehem Steel Co. When he started to work in the No. 4 tank, one of plaintiff's attorneys asked him to look out for light fixtures (107). After working for an hour (120), he found part of a light fixture (116) in that tank (117); and he handed it to one of plaintiff's attorneys (108).

He identified pictures of the fixture (108a; Exhibits 2A–2H), and indicated the approximate place where he had found the fixture by a circular mark on Exhibit 1 (125). This location was about 20 feet away from a point directly below the hatch opening to the tank (119).

Chester further testified that, at the time he found the part of the fixture, he noticed "a small part of a wire under the bulb socket was there" (109). He identified the base of an electric light bulb with a piece of wire sticking out, as part of the fixture when he found it, at which time the base of the light bulb was screwed in the socket of the fixture (109–110; Exhibits 3 and 3A). Clips and two screws were also attached to the fixture when he found it (111; Exhibit 3B). A metal cap was in place on the fixture (113–114; Exhibit 3C).

He identified the small remnant of cable on Exhibit 3 (120–121). At the time Chester recovered the lighting fixture it was not lying flat (122) and "there was a lot of dirt there when I picked it up, a lot of muck and dirt on it" (114). The fixture had been lying in a muddy, rust-like muck, forming a puddle of water at the bottom of the tank (122–123, 127, 133, 135).

The latter statement explains why the droplight had been overlooked by others who had worked in the No. 4 tank before Chester. When covered with water, dirt and muck, the fixture was hardly distinguishable from the surrounding debris and scrap around the light in the tank (129).

Chester impressed the Court as a completely trustworthy and reliable witness. The Court accepts his testimony as to the circumstances under which Exhibit 3, the droplight, was found. There is not the slightest evidence that defendant was "framed" by someone who "planted" Exhibit 3 in the tank after the explosion.

Exhibit 3 was identified by the manufacturer's (Russell & Stoll) representative (in charge of designing its electrical equipment) as the remains of a lamp assembled from part of two types of lamps put out by the manufacturer. The upper part (called "the housing") bearing the No. 1499, was described as a part designed for a 150-watt portable lamp (shown on page 19 of the manufacturer's catalogue Exhibit 68, No. 4585). The catalogue describes the lamp as a standard hook type portable hand lamp (cf. 2043). The lower part of Exhibit 3 ("the globe ring") was designed for a 200-watt fixture lamp (Tanner, 1805–1812; 1819–1820).

On Exhibit 3, bail handles (now broken off) had been attached *after* the lamp left the hands of the manufacturer (2043–2047).

*Lane admitted that, in some instances, he had drilled holes in the lamp housings to affix bail handles, such as appeared to have been broken off Exhibit 3* (4019–4019a). The nipple on Exhibit 2 was made of ferrous metal and came from a lamp put out by another manufacturer. The screws by which the clamps secured the cable were also of ferrous metal, whereas Russell & Stoll used only nonferrous metal in the assembly of its lamps (1815–1817). The lamp holder base of Exhibit 3 indicated that four holes had been drilled in it, in addition to the four originally there, three, of the latter being plugged by broken screws (1838).

Portable lamps similar to No. 4585, also carrying a 150-watt bulb, are known as the bail handle type, No. 4587 (Exh. 68, p. 19; 1814). The globe rings are interchangeable among lamps of all three types; that is, the globe ring designed for a 200-watt fixture lamp may be substituted for the globe ring on either the hook type or bail handle type of portable lamp (1818–1820; Lane, 4114–4015).

Russell & Stoll *had sold to defendant,* as a special order, in April 1948 and in May 1949, assemblies described "Spec. 4595, Explosion proof hand portable complete for 200-watt lamps" and "Spec. 4587, Hand portables for 200-watt lamp" (Exh. 65-P and Exh. 65-Z), *consisting of the housing of its 150-watt portable lamps and the globe rings of a 200-watt fixture lamp (1920–1927; 1946).*

Kennedy admitted that Israelson had lowered one of defendant's droplights in No. 4 port wing tank (2633). There is not the slightest doubt that Exhibit 3 represents the remains of the defendant's droplight which was used in No. 4 port wing tank at the time of the explosion.

If any additional proof were required on that subject, it is furnished by the testimony concerning Exhibit 69, the length of cable.

Kennedy testified that, on December 26, 1951 (the day after the explosion) he, Allen and Lane went over to No. 4 port wing tank; and he and Allen pulled a light cable from the tank. He untied the other end of the cable which had been fastened to the dog of the hatch (2625). Lane notched the cable to be sure they could subsequently identify it as the cable they had pulled out of the tank (2637; Exhibit 69). When questioned by the Court, Kennedy admitted that Exhibit 69 was part of his equipment (2641). Kennedy also admitted that, if the piece of cable which is now part of Exhibit 3 is in fact a piece of the original or part of Exhibit 69, it would be proof that Exhibit 3, the droplight, had been in tank No. 4 (2641). Kennedy was unable to differentiate between the cable wire composing Exhibit 69 and the cable wire attached to Exhibit 3 (2643).

It is undisputed that Exhibit 69, the long length of cable, was notched (for identification purposes) and taken from the Bulkpetrol by defendant the day after the explosion. It is also undisputed that the distal end of this long length

of cable matches perfectly the mutual end of the remnant of cable still attached to the recovered droplight (Exh. 3). It has been established almost to a certainty that the droplight (Exh. 3) had been attached to the cable (Exh. 69).

Defendant, however, makes much of the fact that, while its representatives found the cable hanging in the tank on December 26th (the day after the explosion), plaintiff's witness (Shorrock) testified (343) that he had, on the day of the explosion, pulled out of the tank a length of cable and threw it on the deck. Defendant seeks to cast doubt upon the legitimacy of the cable which it found in the tank on December 26th. The Court, however, finds and concludes that the cable length which defendant saw and took possession of on December 26th, was one and the same cable which Shorrock saw hanging in the tank on December 25th. Shorrock admitted that his recollection of some of the events on December 25, 1951 was "hazy" (378, 386). He did testify that, shortly after the explosion:

> "I just wandered around aimlessly there, and I went back to the hatch of No. 4 tank and I pulled out the wire cable, and I just pulled it out, *and there was nothing on the end of it, it was blown off at the end,* and I think I just threw it or lay it on the deck, * * *" (343).

Shorrock correctly remembered that he pulled out the cable, looked at it, and saw nothing at the end of it, that is, the droplight (as we now know it to be the fact) had been blown off the end of the cable. However, Shorrock's recollection was faulty when he said, "I think I just threw it or lay it on the deck." The cable which Shorrock saw hanging in No. 4 port wing tank, which had "nothing on the end of it," was the identical cable (Exh. 69) with "nothing on the end of it" which defendant's representatives saw hanging in the same tank in the same condition the next day. There is no basis for defendant's suggestion that Exhibit 69 was "planted" in the tank by someone who was trying to "frame" defendant.

The Court has already expressed its findings and conclusions that the relationship between plaintiff and defendant was, at all material times, that of shipowner and independent contractor; that, at no time, did defendant become an agent, employee or joint venturer of plaintiff; nor was there, under any legal theory, joint responsibility for the control, supervision or execution of the tank-cleaning and gas-freeing project; that, whatever statements were made by plaintiff to defendant concerning the use of cold, as distinguished from hot, water were in the nature of suggestions and not orders; that defendant's use of plaintiff's crewmen and officers did not supersede, convert or modify the original relationship; that defendant's use of some of plaintiff's equipment and the availability to defendant of other of plaintiff's equipment did not change the original relationship between the parties; and that all of the tank-cleaning and gas-freeing was "done under the supervision, direction and control of Pyrate" (414).

Notwithstanding the clearly preponderant evidence which establishes the foregoing facts and conclusions, defendant vigorously argues that it was not an independent contractor. It is significant that, in its original answer, defendant expressly admitted that "it undertook to clean and gasfree the S. S. Bulkpetrol."

A reference to the pleadings throws light on the evolution of defendant's defenses.

On May 27, 1952 plaintiff filed a short complaint alleging *inter alia:*

> "2. In the month of December 1951 plaintiff engaged defendant to clean and gasfree plaintiff's steamship Bulkpetrol. Defendant undertook the service and in the course of its performance, on December 25, 1951, negligently caused an explosion in the No. 4 port wing tank of

the vessel, as a result of which plaintiff's vessel was injured, to the plaintiff's damage in the sum of about $500,000."

Thereafter, on June 18, 1952, when defendant seemingly was in default, plaintiff urged defendant to file an answer so that the action could be placed on the calendar, suggesting that if defendant wished to file a general denial it might do so and file an amended answer at any time before October 1, 1952 (5417).

On June 20, 1952, defendant filed an answer, the second paragraph of which was as follows:

"2. *Defendant admits that in December, 1951, it undertook to clean and gasfree the S. S. Bulkpetrol; that in the course of such work and on December 25, 1951,* an explosion occurred in No. 4 port wing tank of the vessel, causing damage to the vessel. Defendant denies the other allegations contained in paragraph '2' of the complaint." (Emphasis supplied.)

The first shift is indicated in defendant's amended answer filed on September 29, 1952, in which it is alleged:

"Second: Admits that in the month of December, 1951, defendant was engaged to clean cargo tanks on the S. S. Bulkpetrol *but under the supervision, direction and control, and with the assistance of plaintiff, its agents, servants or employees;* that on December 25, 1951, in the course of such work, an explosion occurred in No. 4 port wing tank of the vessel, causing damage to the vessel; and except as expressly admitted, denies the allegations set forth in paragraph '2' of the complaint." (Emphasis supplied.)

On October 30, 1952, plaintiff took the pretrial deposition of Kennedy and Allen. Kennedy deposed, as he subsequently testified on the trial, that about a week or so prior to the commencement of the job (4814), he had made an oral contract with plaintiff's marine superintendent, Walling, by which defendant undertook to clean and gas-free the vessel and prepare her for the shipyard (212, 4652, 4653), providing labor, materials and equipment (779–780), the price to be fixed upon the completion of the job (779–780, 792; cf. Allen, 955–957; Walling, 4285–4287).

On March 1, 1956, defendant served notice that "prior to the commencement of the trial" defendant would move "to amend its answer so as to affirmatively allege assumption of risk and contributory negligence" (26).

In its opening statement, defendant contended that, during the progress of defendant's operation, its status as an independent contractor had been modified (97–103).

On May 4, 1956, one month *after* the commencement of the trial, defendant asked leave to file a second amended answer containing, *inter alia,* the following (cf. 2769–2773, 3094–3136):

" * * * Second: Admits that in the month of December, 1951, defendant orally was engaged to furnish men and materials to work on cleaning and gas freeing cargo tanks on the S. S. Bulkpetrol *but during the course of operations plaintiff, its agents, servants or employees took over the supervision, direction and control, and assumed the performance of major segments of the work and in order to speed up the work rendered assistance to and furnished materials and equipment to defendant;* that on December 25, 1951, while the tanks were being cleaned an explosion occurred in No. 4 port wing tank of the vessel, causing damage to the vessel; and, except as expressly admitted, denies the allegations set forth in paragraph '2' of the complaint." (Emphasis supplied.)

Leave to file the second amended answer was subsequently granted.

▮ The Court finds that the evidence offered in support of defendant's defense, above quoted, was completely unreliable. The Court finds and con-

cludes that defendant did not establish any of its defenses, including the defenses of plaintiff's assumption of risk and plaintiff's contributory negligence.

Kennedy, who actively participated in planning it (4632, 4635, 4642), was foreclosed by his pretrial deposition (4683–4684) from testifying that he had negotiated, or been present at the negotiation of, any alteration of the contract he had made with Walling (4685–4686). Kennedy, however, gathered the impression that Allen would testify to having had a conversation with the mate, and possibly with the master (4687–4689), presumably involving a change in the original contract (4695–4699). The matter of blowers was considered to be a paramount element in planning the defense, and there was consideration of what evidence might be obtained on that subject (4691–4692).

The defense was built around one piece of truth and another piece of partial truth. The element of truth was that, on the day before the explosion, defendant had arranged to employ as many of the members of the ship's crew as might be willing to work for defendant during their off-duty hours. The element of partial truth related to a suggestion, made much earlier, that the vessel, having carried Kuwait crude oil, could be cleaned more efficiently with cold water than with hot.

On the slender foundation of those two incidents, defendant unsuccessfully undertook to prove that defendant was ordered to change its method of cleaning at the same time it employed the members of the crew; that blowers or other devices for ventilating the tanks were not required or ordinarily used when tanks were washed with hot water; and that defendant deferred to plaintiff's order upon the understanding that plaintiff would provide ventilation for the tanks, which defendant had no means or expectation of providing.

Whatever the relative merits of hot water and cold water in washing tanks that have carried Kuwait crude oil, the need for ventilation is substantially the same whether they have been washed with one or the other. Tanks forty feet deep do not dependably free themselves of gas after either kind of washing when the escape openings measure only a fraction of one percent of the surface area of the tank. Defendant's experts so testified (Mercer, 4530; Murray, 6667–6670; 4547–4549), as did every other witness who touched on the point (Bird, 1336–1337; Shorrock, 1112–1113; Purdy, 3203–3204), save defendant's officers and Lamanna.

Kennedy admitted that the duty of ascertaining whether a tank was adequately washed, or should be rewashed, normally rested on defendant's general foreman, in this case Lamanna; and that he also was normally charged with the duty of ascertaining whether a tank had been sufficiently ventilated for the muckers to work in it (Kennedy, 4659–4660).

The Court has already set forth its specific findings that the fact that the ship's crewmen and officers worked for defendant on their own off-duty time did not change the independent contractor relationship between plaintiff and defendant.

Lamanna's testimony about the speed-up of the job, the alleged directive to use cold water, the alleged blower or blowers supplied by Shorrock, and Shorrock's assumption of responsibility for proper ventilation (3741–3742, 3740–3743, 3803, 3806–3809, 3826–3827, 3831) is, in the Court's opinion, contrary to the facts and is, accordingly, rejected.

■■■■ Defendant's argument that plaintiff's master was not relieved of responsibility, notwithstanding plaintiff's engagement of defendant as an independent contractor, does not apply to this action by plaintiff against defendant. See Geotechnical Corp. of Delaware v. Pure Oil Co., 5 Cir., 1952, 196 F.2d 199, 203. The rule that a master is at all times responsible for the safety and proper navigation of the vessel, and that he cannot relieve himself of that responsibility, applies where the action is, typically, by an injured third party and the

shipowner attempts to avoid liability by claiming that the master's duty has been delegated to another, such as a towing company or pilot. Robins Dry Dock & Repair Co. v. Navigazione Libera Triestinea, 2 Cir., 1929, 32 F.2d 209; Charente S. S. Co. v. United States, 5 Cir., 1926, 12 F.2d 412. Such is not the case here.

 We turn now to defendant's charge of "statutory fault" on the part of plaintiff. Defendant strongly argues that plaintiff is barred from recovery because of plaintiff's "statutory fault" in violating an allegedy applicable Coast Guard regulation. The particular regulation relied on by defendant is contained in Tank Vessel Regulations, promulgated on March 1, 1951 and effective July 1, 1951 (C.F.R., title 46 ["Shipping"] Chapter I ["Coast Guard"], Subchapter D ["Tank Vessels"], Part 35 ["Operations"], Subpart 35:30 ["General Safety Rules"], p. 153, section 35:30–10).

This regulation reads as follows:

"35.30–10. *Cargo tank hatches, ullage holes, and Butterworth plates-TB/ALL.* No cargo tank hatches, ullage holes, or Butterworth plates shall be opened or shall remain open without flame screens, except under the supervision of the senior member of the crew on duty, unless the tank opened is gas free."

It is the Court's opinion that the above-quoted regulation did not apply to the Bulkpetrol at the time of the explosion as a matter of law and as a matter of fact, for a number of independent reasons which will now be discussed.

### 1.

The regulation was not applicable as a matter of law because this regulation applied to a tank vessel only when it had *liquid cargo in bulk on board.* The Bulkpetrol had completely discharged its crude oil cargo several days before the explosion on December 25, 1951 and, therefore, at the time of the explosion it did not have "on board" any inflammable or combustible "cargo in bulk."

The text of the statutory authority for the promulgation of the regulation under consideration is found in Title 46 U.S.C.A. § 391a, entitled "Vessels *having on board* inflammable or combustible liquid *cargo in bulk.*" (Emphasis supplied.) Defendant relies on that section as the statutory authority for the regulation now being discussed (defendant's main post-trial brief, p. 144).

Subdivision (1) of section 391a, entitled "Vessels included," provides, in part, as follows:

"All vessels, * * * that shall *have on board* any inflammable or combustible liquid *cargo in bulk,* * * * shall be considered steam vessels for the purposes of title 52 of the Revised Statutes and shall be subject to the provisions thereof: * * *." (Emphasis supplied.)

Subdivision (2) of section 391a, entitled "Rules and regulations for *handling* liquid *cargo*" (emphasis supplied) provides, in part, as follows:

"In order to secure effective provision against the hazards of life and property created by the *vessels to which this section applies,* the Commandant of the Coast Guard shall establish such additional rules and regulations as may be necessary with respect to the design and construction, * * * including * * * places for stowing and carrying such liquid *cargo,* fittings, equipment, appliances, * * *; and with respect to the handling and stowage of such liquid *cargo;* * * and with respect to * * * appliances for * * * fire protection; and with respect to * * * the duties * * * of the officers and crews thereof; * * *. In establishing such rules and regulations, the Commandant of the Coast Guard shall give due consideration to the kinds and grades of such liquid *cargo* permitted to be on board such vessel." (Emphasis supplied.)

The preface to the Tank Vessel Regulations written by Coast Guard Commandant Vice-Admiral Merlin O'Neill, dated March 1, 1951 (Treas. Dept. U. S.

Coast Guard, Tank Vessel Regulations, CG123) states:

"These 'Tank Vessel Regulations' are applicable to all vessels regardless of tonnage or size, whether self-propelled or not, and whether carrying freight or passengers for hire or not, that *have on board* any inflammable or combustible liquid *cargo in bulk.*" (Emphasis supplied.)

Table 30:01–5(d) of the Tank Vessel Regulations (46 C.F.R., parts 1–145, at p. 91) describes the vessels subject to the particular regulation as "all vessels carrying combustible or inflammable liquid *cargo in bulk.*" (Emphasis supplied.)

46 C.F.R. section 30:10–5 (at p. 93) defines "cargo" as "combustible *liquid,* inflammable *liquid,* or *liquefied* inflammable gas unless otherwise stated." (Emphasis supplied.)

The vessel having completely discharged all the crude oil into shore tanks of the Gulf Oil Corporation, was *without* "cargo." Cf. the definition of "cargo" in Ryan Stevedoring Co., Inc. v. United States, 2 Cir., 1949, 175 F.2d 490, 494, certiorari denied 1949, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553.

Consequently, 46 U.S.C.A. § 391a, and the regulation promulgated pursuant to that statute, did not apply to the Bulkpetrol on December 25, 1951, the day of the explosion.

It is to be noted that 46 U.S.C.A. § 391a contains subdivision (7), entitled "Penalties," which provides that a violation of the provisions of section 391a "or of the rules and regulations established hereunder"—regardless of wilfulness—is punishable by a fine or imprisonment or both. Thus, section 391a, being quasi-penal, should not be given an expansive interpretation, but should be limited to the situations specified by its terms. McHoney v. Marine Navigation Company, 4 Cir., 1956, 233 F.2d 769.

The McHoney case is a close and persuasive analogy. In that case, the Court was required to interpret a Coast Guard Regulation relating to the loading of sulphur in bulk. Plaintiffs-longshoremen received injuries as a result of a flash fire in a hold of defendant's vessel. Plaintiffs charged that the fire was caused by unseaworthiness of the vessel and defendant's negligence.

The only issue upon the appeal was whether the particular Coast Guard Regulation (referring to sulphur as a dangerously inflammable cargo) was applicable to the facts of the case, which showed that the sulphur was being *unloaded.* Under the Coast Guard regulation, it was a requirement that a fire hose supplied with fresh water from a shore supply source be available at each hatch through which the sulphur was being *loaded.* The Court, through Circuit Judge Dobie, held (at page 770):

"Our decision is rested squarely upon the ground that the Coast Guard Regulation in question *does not apply* to the *unloading* of sulphur. (Emphasis in original.)

The Court pointed out that, under the particular Coast Guard regulation, the requirement of the availability of a fire hose at each hatch was applicable to a hatch through which the sulphur is being "loaded," but that the regulation did not apply to a hatch through which the sulphur was being "unloaded" as distinguished from being "loaded."

Judge Dobie went on to say (at page 771):

"The Coast Guard Regulation is in the nature of a penal regulation, promulgated by the Coast Guard pursuant to Title 46 U.S.C.A. § 170, Subsection 7. Subsection 15 of the same section of the code provides that 'When the death or bodily injury of any person results from the violation of this section or any regulations made in pursuance thereof' the person who violated the provisions of the section or the regulations shall be fined 'not more than $10,000 or imprisoned not more than ten years, or both.' Other severe penalties are prescribed against the owner, charterer, agent, master or person in charge of the vessel when

these regulations are violated. Accordingly, it should not be expansively interpreted. Cf. Kordel v. United States, 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52; Schmokey v. United States, 10 Cir., 182 F.2d 937."

The penalty provisions of 46 U.S.C.A. § 170, discussed by Judge Dobie, supra, are contained in subdivisions (14) and (15) of section 170, both of which become operative only when the violation was "knowingly" committed. The cognate penalty provision in section 391a (7), however, creates criminal liability regardless of *mens rea*. The reasoning of Judge Dobie is *a fortiori* pertinent to the regulation now before the Court; hence, that regulation did not apply to the Bulkpetrol when it did not have liquid cargo in bulk on board.

### 2.

If we assume *arguendo* that the regulation was applicable as a matter of law, notwithstanding the absence from the vessel of liquid cargo in bulk on board: the regulation was inapplicable to the vessel *as a matter of fact*, in view of the nature of the tank-cleaning and gas-freeing activities that were being carried on at No. 4 port wing tank at the time of the explosion.

The requirement—that no cargo tank hatch, ullage hole, or Butterworth plate shall be opened or shall remain open without flame screens, except under the supervision of the senior member of the crew on duty, unless the tank opened is gas-free—could not apply to No. 4 port wing tank while it was in the process of being tank-cleaned and gas-freed.

By the evening of December 25, 1951, the tank had been washed and Butterworthed. The tank had to be opened and kept open *without* a fire screen in order to tank-clean it and to permit the residual gases to escape from the hatch opening, ullage holes and Butterworth plate holes by means of convection ventilation. Men (Ohlsen and Hofstetter) had to go down into the tank through the hatch opening for the purpose of

mucking. A man (Israelson) had to be stationed at the hatch opening to handle (connect, raise or lower) the droplight and the light cable. Pails, shovels and other equipment had to be lowered into and raised out of the tank. When the pails are filled with muck, two men (2516) lift them. A block and tackle with a safety rig was used (2514–2516). It is obvious that the very process of mucking can be carried on only when the hatch is opened and kept open without a fire screen. Moreover, the fine gauge specifically prescribed by the regulations for a flame screen (section 30:-10–25) would have materially impeded the continuous ventilation of the tank and the escape of residual gas fumes from the tank. The regulation required "a single screen of corrosion-resistant wire of at least 30 by 30 mesh, or two screens, both of corrosion-resistant wire, of a least 20 by 20 mesh, spaced not less than ½ inch or more than 1½ inches apart."

Thus, the practical realities of tank-cleaning and gas-freeing demonstrate convincingly that, under the particular circumstances prevailing on the Bulkpetrol on the evening of December 25, 1951, the literal requirements of Regulation 35.30–10 became and were inapplicable.

### 3.

If we further assume *arguendo* that the regulation was applicable both as a matter of law and as a matter of fact: then the doctrine of "statutory fault" would become operative.

The Pennsylvania, 1873, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148; The Martello, 1894, 153 U.S. 64, 14 S.Ct. 733, 38 L.Ed. 637; Lie v. San Francisco & Portland S. S. Co., 1917, 243 U.S. 291, 37 S.Ct. 270, 61 L.Ed. 726; The Papoose, 2 Cir., 1936, 85 F.2d 54; The M. M. Chase, D.C.S.D.N.Y.1889, 37 F. 708; The Denali, 9 Cir., 1939, 105 F.2d 413, 418, also 9 Cir., 112 F.2d 952, 955–958, certiorari denied sub nom. Alaska S. S. Co. v. Pacific Coast Coal Co., 311 U.S. 687, 61 S.Ct. 65, 85 L.Ed. 444. See Dimas v. Lehigh Valley Railroad Com-

pany, 2 Cir., 1956, 234 F.2d 151, 155, 156; Mason v. Lynch Brothers Company, 4 Cir., 1956, 228 F.2d 709, 712.

Under that doctrine, as expounded in the above-cited cases, the plaintiff, if violator of the regulation, would have the burden of proving "that by no possibility could the violation have contributed to the accident." See, e.g., Dimas v. Lehigh Valley Railroad Company, 2 Cir., 1956, 234 F.2d 151, 156; Petition of Diesel Tanker A. C. Dodge, Inc., 2 Cir., 1956, 234 F.2d 374, 377.

The evidence in this case convincingly establishes that "by no possibility" could plaintiff's failure—to have a flame screen on the hatch or other openings or to have the senior member of the crew on duty exercise supervision—have caused or contributed to the cause of the explosion. The vessel's tubes were blown a considerable time before the occurrence of the explosion. Just prior to the explosion, the third officer on watch on the bridge did not see any sparks (Runge, 3471). It was foggy. There was either rain, sleet or snow.

The Court finds that it was the regular and standard practice on the Bulkpetrol for the second assistant to blow the tubes at about four o'clock in the afternoon, as soon as he went on watch. (Bird, 1525, 1532–1533; Lennon, 1555–1556). The tubes were not blown at or about 8 P.M. (Bird, 1525, 1526). The following physical construction of the Bulkpetrol and the relative location of the funnel and No. 4 port wing tank have also been considered by the Court: the funnel or stack was about 300 feet away from the No. 4 port wing tank; the midship housing (27 feet wide and 36 feet high) was *between* the funnel (which was 36 feet tall) and the No. 4 port wing tank; the midship housing was 160 feet from the funnel and 120 feet on the other side from the No. 4 port wing tank (Mercer, 4537; Sheridan, 6452–6457, 6487; Exhs. [2d series] B, C, D). Mercer, one of defendant's experts, contradicted Sheridan, another of defendant's experts, with respect to

the distance that a spark could travel in a fog and rain. On this point, Mercer's testimony—that a spark would penetrate a fog and rain only "a few feet"—is more credible than Sheridan's opinion that a spark could travel hundreds of feet in such weather (Mercer, 4537, 4539). Sheridan's opinion testimony as a whole, on the subject of sparks, is rejected by the Court as inexpert and unreliable (Sheridan, 6518, 6522–6533).

Plaintiff sustained the burden of proving that any alleged violation by it of the regulation could not and did not cause or contribute to the cause of the explosion. The mere violation of the regulation, without more, is insufficient to render plaintiff guilty of "active" negligence and so to debar it from recovering from defendant. Cf. Kozman v. Trans World Airlines, Inc., 2 Cir., 1956, 236 F.2d 527, 535; Lowery v. Hudson River Day Line, D.C.E.D.N.Y. 1955, 132 F.Supp. 629.

4.

Finally, it must be said that defendant, having agreed and undertaken to supervise its work in a safe and proper manner, cannot, in this private suit, be permitted to set up its own neglect of that duty as a statutory fault on the part of plaintiff, who engaged defendant to do the work (Allen, 2342–2343). Cf. Geotechnical Corp. of Delaware v. Pure Oil Co., 5 Cir., 1952, 196 F.2d 199, 203.

Upon the trial and in its post-trial briefs, defendant has placed great stress upon plaintiff's private regulations and safety rules (Defendant's Exh. DD; see record 4408, 4571). These rules and regulations were prepared by plaintiff "for the guidance of the seagoing personnel in the operation of our vessels. They are intended, moreover, to serve as a guide for uniform practices leading to efficient and economical operation throughout the fleet" (4435, 4571–4572). There are specific rules and a circular letter relating to cleaning and gas-freeing tanks (4572–4576), preven-

tion of accidents (4577), and the master's and other officers' duties (4578–4582).

Defendant offered these rules and regulations into evidence on the triple theory (1) that they constituted "an admission on the part of libelant as to what are proper safety practices"; (2) that they are some evidence of contributory negligence, if they were not followed by plaintiff's officers and employees; and (3) that they are material to the question of "who had the control and responsibility over the Bulk-petrol during the tank-cleaning process" (4435–4438, 4582). In elaboration of the second branch of the theory, defendant argued that plaintiff's safety rules were made for the protection and preservation of plaintiff's property (4448) "from damage and accident, such as happened here" (4449); and that, since plaintiff was under a duty owing to itself to preserve its property, plaintiff's safety rules and any violations thereof were "pertinent on contributory negligence" (4450).

Extensive argument was had during the trial on the question of the relevancy and materiality of the proferred evidence, and the question was fully briefed (4318–4319, 4409–4413a, 4430–4469). The Court rendered its "provisional and qualified" ruling (4450–4459), admitting the evidence over plaintiff's objection (4466).

There is little to be added to the Court's original opinion as expressed during the trial (4450–4459), except to underscore the critical point made by Circuit Judge Waterman in Renaldi v. N. Y., N. H. & H. R. Co., 2 Cir., 1956, 230 F.2d 841, 844, that private safety rules are properly admitted into evidence "when their *purpose* is to protect the class of persons *by whom suit is brought and when their violation can reasonably be said to contribute to the injury sued upon*. Krasnow v. National Airlines, Inc., 2 Cir., 1955, 228 F.2d 326; Dundom v. New York Cent. R. Co., 2 Cir., 1944, 145 F.2d 711. These prerequisites were satisfied in this case." (Emphasis supplied.)

Judge Waterman, in Krasnow v. National Airlines, Inc., 2 Cir., 1955, 228 F.2d 326 at page 327 had expounded the same view when he said:

"The plaintiff contends that evidence of an airline rule to the effect that passengers were not allowed to drink from their own bottles was erroneously excluded. A private regulation of a common carrier may have some relevance in a negligence action brought by a passenger when the *purpose* of the regulation is to protect passengers and when a violation of the regulation by company employees causes or contributes to the injury sued upon. See Boston & Maine R. R. v. Daniel, 2 Cir., 1923, 290 F. 916, 922; Peterson v. Boston & Maine R. R., 1941, 310 Mass. 45, 36 N.E.2d 701, 705; cf. Frizzell v. Omaha St. Ry. Co., 8 Cir. 1903, 124 F. 176. We think it probable that the *purpose* of the airline regulation here involved was not the safety of passengers, but the protection of the airline's revenues from the sale of beverages." (Emphasis supplied.)

Various aspects of the same principle governing the subject of private safety rules are illustrated in such cases as Johnson v. Erie Railroad Co., 2 Cir., 1956, 236 F.2d 352; Perrone v. Pennsylvania R. Co., 2 Cir., 1943, 136 F.2d 941; and DeRyss v. N. Y. Central R. R. Co., 1937, 275 N.Y. 85, 9 N.E.2d 788.

In the Johnson case, supra, 236 F.2d at page 356, it was said that a violation of a railroad's safety rule requiring proper warning of a locomotive coupling, if proved, would constitute "some evidence of negligence," in an F.E.L.A. case. In the Perrone case, supra, 136 F.2d at page 943, it was held that the violation of a defendant-railroad's safety rule might be evidence of negligence where the injured party had been led to rely for his safety on the railroad's en-

forcement of that particular safety rule. In the DeRyss case, supra, 275 N.Y. at page 93, 9 N.E.2d 788, 790, the railroad's employee had violated the railroad's safety rules by permitting a hunter to trespass on the railroad's property, with the result that the hunter shot a gun and killed plaintiff's decedent. The New York Court of Appeals said:

"The watchman and the shooter might be liable, but not the owner. His rules and instructions, like those of the railroad in this case, were made for his advantage, not disadvantage; the injured person could not claim that the watchman was negligent because he had violated his employer's instructions to permit no trespassing. The plaintiff in this case cannot predicate the company's liability on a violation of its own rules against trespassers; these were made for its protection not to give the right of recovery to strangers; to define the duties of employees, not to increase the company's liability. If no liability existed in the absence of these rules, surely none was created by the caution which prompted them. These few fundamental common-law principles of master and servant may be found in sections 315, 318 and 348 of the Restatement of the Law of Torts [American Law Institute]."

Where, as in the case at bar, the defendant-independent contractor did not itself suffer injury; was completely unaware of and did not rely upon the existence of certain so-called safety rules of plaintiff, and utilized its own employees and equipment to do the job for which it was engaged, it is no answer for defendant to say that plaintiff should have insisted that defendant comply with plaintiff's safety rules or that plaintiff's personnel comply with such rules in order for plaintiff to protect itself from defendant's negligence.

It would be a caricature of justice to permit defendant now to claim that plaintiff was guilty of contributory negligence, because plaintiff relied upon defendant's representation and warranty of its skill as a specialist.

Plaintiff's rules were prescribed for the guidance of its own employees, who were not or might not be experts. These rules were prescribed to govern the conduct of plaintiff's employees when they might be engaged in doing the tank-cleaning and gas-freeing work which defendant was engaged to do.

Even the most stringent of plaintiff's rules is specifically addressed to a situation in which plaintiff's personnel is being assisted by shore workmen. In the present case, plaintiff's personnel were not working for plaintiff in the tank-cleaning and gas-freeing project. That work was contracted to be done and was being done by defendant, acting independently, acting with pretended or represented expertness, following its own rules and pursuing its own methods.

Rules which a shipowner might lay down to govern the work of its employees might be wholly inapplicable to work of the same kind being done by an independent contractor engaged to do painting, scaling, repairing or—as here—tank-cleaning.

Defendant herein was not an intended beneficiary of plaintiff's safety rules. Defendant-corporation was an independent contractor, a professed and avowed expert, which undertook to tank-clean and gas-free the vessel for plaintiff. Defendant is answerable to plaintiff for defendant's own negligence in violation of its duty to plaintiff.

Defendant's agreement to tank-clean and gas-free the Bulkpetrol necessarily included defendant's obligation to tank-clean and gas-free the vessel properly and safely. We quote and paraphrase the language in Ryan Stevedoring Co. v. Pan-Atlantic Corp., 1956, 350 U.S. 124, 133–135, 76 S.Ct. 232, 237, 100 L.Ed. 133, as indicating the rationale of the Supreme Court in dealing with a closely analogous problem: "Competency and safety * * * are inescapable elements of the service undertaken. This obliga-

tion is not a quasi-contractual obligation implied in law or arising out of a non-contractual relationship. It is of the essence of" defendant's tank-cleaning and gas-freeing "contract." It is defendant's "warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product. * * *" Defendant suggests that, because plaintiff had a right to stop unsafe methods of tank-cleaning and did not do so, "it now should be barred from recovery from the" defendant of "any damage caused by that contractor's uncorrected failure" to clean and gas-free the tanks "in a reasonably safe manner. Accepting the facts and obligations as above stated, the shipowner's present claim against the contractor should not thereby be defeated. * * * it is clear that, as between themselves, the contractor, as the warrantor of its own services, cannot use the shipowner's failure to discover and correct the contractor's own breach of warranty as a defense." Plaintiff's "failure to discover and correct" defendant's "own breach of contract cannot here excuse that breach."

It might be that a *stranger* could point to the Coast Guard regulations and to plaintiff's rules, or to either, and persuasively assert that their purpose was to protect the public and that their violation had contributed to the stranger's injury. In the same circumstances, the same assertion might be equally effective if set up by the *stranger* as a defense to a claim by plaintiff. There is no occasion to consider those possibilities, because, as between plaintiff and defendant, the former had entrusted to the latter the performance of whatever duty was created by those regulations and rules and any violation of them was defendant's act or omission, for which it was answerable to plaintiff under defendant's warranty of good workmanship.

The Court has considered the evidence relating to plaintiff's safety rules with respect to all of the purposes for which defendant offered it. When considered as relevant to the standard of care— "just like the practise in the trade" (defendant's attorney, at 4436)—the evidence points up defendant's failure to comply with such standard. Such evidence does not tend to prove plaintiff's contributory negligence or assumption of risk because defendant had been engaged as an expert specialist to perform this very work and plaintiff had the right to rely upon defendant's safely performing the job (see e.g., 394).

There is not the slightest evidence that defendant was a person for whose protection plaintiff's safety rules were promulgated; nor is there any evidence that plaintiff's alleged violations of its rules caused or contributed to the explosion. This is not the case where a plaintiff may be guilty of contributory negligence in failing to use ordinary prudence to avoid receiving the injury. See Phillips Petroleum Company v. Gibson, 5 Cir., 1956, 232 F.2d 13, 19.

As the proper standard of care is a question of law, in cases tried without a jury (Dale v. Rosenfeld, 2 Cir., 1956, 229 F.2d 855, 858), the views detailed in the foregoing opinion are to be deemed to express conclusions of law, as well as findings of fact.

The standard of defendant's liability in this case was negligence; and the question was what a reasonable and prudent person would have done under the circumstances. In violation of that duty, defendant failed to use such reasonable care. Defendant's negligence was the competent producing and proximate cause of the explosion and the resulting injuries and damages to plaintiff. In its discretion (Newburgh Land & Dock Corp. v. Texas Company, 2 Cir., 1955, 227 F.2d 732, the Court allows interest to plaintiff from the date of the injury or loss.

The Court has jurisdiction of the parties to and the subject matter of this action.

The findings of fact and conclusions of law upon which the Court's judgment is based are set forth in this opinion.

934

Cf. Hecht, Levis & Kahn, Inc. v. S. S. President Buchanan, 2 Cir., 1956, 236 F.2d 627, 629.

The Clerk is directed to enter an interlocutory decree in favor of plaintiff against defendant for plaintiff's full damages, with interest and costs. The issue of the amount of plaintiff's damages will be referred to Cloyd Laporte, Esq., as special commissioner, who will ascertain and compute the damages and report thereon to this Court. Submit formal interlocutory decree in accordance with the foregoing, within five days from the date of The New York Law Journal's notice of this opinion and decision.